REVISED - March 17, 2000

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

**No. 98-20653**

**PAMELA LYNN PERILLO,**

**Petitioner-Appellee,**

**VERSUS**

**GARY L. JOHNSON, DIRECTOR, TEXAS DEPARTMENT
OF CRIMINAL JUSTICE, INSTITUTIONAL DIVISION,**

**Respondent-Appellant.**

Appeal from the United States District Court
for the Southern District of Texas

March 2, 2000

Before SMITH, EMILIO M. GARZA, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge.

Gary Johnson, the Director of the Texas Department of Criminal Justice's Institutional Division, ("the Director") appeals the district court's final judgment granting Pamela Perillo's 28 U.S.C. § 2254 petition for habeas corpus relief. The district court determined that Perillo's trial counsel labored under an actual conflict of interest that adversely affected counsel's presentation of Perillo's defense on the issues of both guilt and punishment at her 1980 trial. The district court therefore vacated the criminal judgment against Perillo, both as to her conviction and her death sentence, and ordered that Perillo be released unless the State of Texas elected to retry her within 120 days of the date upon which the district court's decision became final. After an exhaustive

review of the unique factual scenario presented in this case, we affirm.

I.

This is the second time this case has been before our Court for decision. In March 1996, our Court reviewed Perillo's appeal from the district court's decision granting the Director summary judgment and denying relief. *See* **Perillo v. State**, 79 F.3d 441 (5th Cir. 1996) (**Perillo I**). In that decision, we determined that Perillo was entitled to investigate her Sixth Amendment claim through discovery and an evidentiary hearing narrowly tailored to address whether trial counsel Jim Skelton's prior and concurrent representation of Linda Fletcher, the state's star witness against Perillo, created an actual conflict that adversely affected Skelton's performance at Perillo's trial. *See* **id**.

The parties argue that our disposition of this second appeal is in some measure determined by our prior consideration of this case. The Director argues that this Court's focus in the prior opinion upon particular factual disputes, those relating to Skelton's concurrent representation of Fletcher in California, precludes the district court's identification of any other facts that support a finding of actual conflict in the record. We disagree. As an initial matter, we note that the district court did not venture far afield of our prior decision; the factual context relied upon by the district court, the circumstances surrounding Skelton's cross-examination of Fletcher at Perillo's trial, is in fact raised in our prior opinion. *See* **id**. at 450-51.

2

Moreover, this appeal is presented in a different posture and demands a different standard of review from the first appeal. *See Society of Roman Catholic Church of Diocese of Lafayette, Inc. v. Interstate Fire & Casualty Co.*, 126 F.3d 727, 735 (5th Cir. 1997) (noting that application of the law of the case doctrine is inappropriate when the relevant issues are governed by different standards of review). The prior appeal, which was from summary judgment without discovery or an evidentiary hearing, presented the issue of whether there was a factual dispute, *which if resolved in Perillo's favor*, would entitle her to relief. *See Perillo I*, 79 F.3d at 444. Thus, this Court did not purport to find an actual conflict of interest or an adverse effect arising from that conflict. *See id*. at 444, 451. The Court simply focused upon one factual dispute, which if resolved in Perillo's favor, would support relief. The Court did not, and did not need to, try to identify every factual dispute that could give rise to relief. For that reason, our prior opinion should not be viewed as foreclosing the district court's reliance upon a slightly different factual context for its determination that Perillo's counsel Skelton labored under an actual conflict that adversely affected his performance.

Perillo argues that the prior opinion is binding to the extent it constitutes this Court's reasoned position on presumed facts that are confirmed by the record on remand. While this argument is closer to the mark, we take issue with Perillo's broad suggestion that we are constrained to afford relief on the force of our prior

3

disposition. The law of the case doctrine is a matter of judicial discretion rather than judicial power when a court is reviewing its own prior decision. *See* **United States v. O'Keefe**, 169 F.3d 281, 283 (5th Cir. 1999); *see also* **United States v. Castillo**, 179 F.3d 321, 326 (5th Cir. 1999), *cert. granted* , 120 S. Ct. 865 (2000). . Moreover, while we may certainly choose to rely upon our prior disposition of those factual or legal issues that are either unaffected by the different procedural posture or unchanged by the record on remand, those determinations identified by Perillo are not necessarily determinative of her claim. We therefore review the district court's decision granting relief in light of all of the relevant evidence, including the evidence on remand, and in light of the standard of review appropriate to the procedural posture of this appeal.

The present appeal is from the district court's final judgment that Perillo demonstrated an actual conflict of interest that adversely affected Skelton's presentation of her defense. *See* **Cuyler v. Sullivan**, 100 S. Ct. 1708 (1980). The determinations of actual conflict and adverse effect are mixed questions of fact and law, which we review de novo. *See* **Strickland v. Washington**, 104 S. Ct. 2052, 2070 (1984); **Cuyler**, 100 S. Ct. at 1715; **United States v. Placente**, 81 F.3d 555, 558 (5th Cir. 1996); **Perillo I**, 79 F.3d at 446. The district court's underlying factual determinations, which were made after full discovery and two evidentiary hearings, are entitled to substantial deference, and should be reversed only if they are shown to be clearly erroneous. *See* **Strickland**, 104 S. Ct.

4

at 2070; *Placente*, 81 F.3d at 558.

## II.

Perillo's claim that she was denied her Sixth Amendment right to effective assistance of conflict-free counsel at trial because her trial attorney, Jim Skelton, was acting under the influence of an actual conflict that adversely affected his performance at her trial is governed by *Cuyler v. Sullivan*, 100 S. Ct. 1708 (1980) and its progeny. *See Strickland v. Washington*, 104 S. Ct. 2052, 2064-67 (1984); *Beets v. Scott*, 65 F.3d 1258 (5th Cir. 1995) (en banc). The *Cuyler* standard applicable when a criminal defendant alleges that counsel's performance was impaired by an actual conflict of interest differs substantially from the *Strickland* standard generally applicable to Sixth Amendment ineffectiveness claims. *See Strickland*, 104 S. Ct. at 2067; *see also Beets*, 65 F.3d at 1265. *Strickland* requires a showing that counsel's performance was deficient, in that it fell below an objective standard of reasonableness, as well as a showing of prejudice, which is defined as a reasonable probability that counsel's error changed the result of the proceeding. *See Strickland*, 104 S. Ct. at 2064-69; *Perillo I*, 79 F.3d at 447; *Beets*, 65 F.3d at 1265. *Cuyler*, on the other hand, permits a defendant who raised no objection at trial to recover upon a showing that an actual conflict of interest adversely affected counsel's performance. *See Cuyler*, 100 S. Ct. at 1718; *Perillo I*, 79 F.3d at 447; *Beets*, 65 F.3d at 1264; *see also Strickland*, 104 S. Ct. at 2067.

An "actual conflict" exists when defense counsel is compelled

5

to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client. *See* *id*. at 2067; *Perillo I*, 79 F.3d at 447; *United States v. Alvarez*, 580 F.2d 1251, 1254 (5th Cir. 1978); *see also* *Beets*, 65 F.3d at 1270 (limiting *Cuyler* to cases of multiple representation). "Adverse effect" may be established with evidence that "some plausible alternative defense strategy or tactic" could have been pursued, but was not because of the actual conflict impairing counsel's performance. *See* *Perillo I*, 79 F.3d at 449. Assuming the defendant establishes an actual conflict that adversely affected counsel's performance, prejudice is presumed without any further inquiry into the effect of the actual conflict on the outcome of the defendant's trial. *See* *Strickland*, 104 S. Ct. at 2067; *Cuyler*, 100 S. Ct. at 1719; *Beets*, 65 F.3d at 1265. "[U]nconstitutional multiple representation is never harmless error." *See* *Cuyler*, 100 S. Ct. at 1719.

Beyond those basic legal precepts, *Cuyler*'s "actual conflict" and "adverse effect" elements have been described as "rather vague." *See* *Beets*, 65 F.3d at 1265. Even a brief review of the precedent reveals that any categorical treatment of when an actual conflict exists is difficult. *Compare* *United States v. Olivares*, 786 F.2d 659 (5th Cir. 1986) (cross-examination of a state witness that was also a former client did not give rise to an actual conflict) *with* *United States v. Martinez*, 630 F.2d 361 (5th Cir. 1980) *and* *Alvarez*, 580 F.2d 1251 (cross-examination of state

6

witness that was also a former client gave rise to an actual conflict). Instead, the determination of actual conflict and adverse effect is tightly bound to the particular facts of the case at hand. *See*, *e.g.*, **Maiden v. Bunnell**, 35 F.3d 477, 481 (9th Cir. 1994). For that reason, a fairly lengthy review of the relevant facts, as enriched by the evidence submitted in the district court on remand and developed in the district court's decision, is essential to our disposition of this case. Except where we have expressly noted otherwise, we have adopted as without error the district court's explicit and implicit fact findings on remand.

## III.

### A.   The Crimes and Perillo's Statements to Police

More than nineteen years ago, Pam Perillo, Mike Briddle, and Briddle's wife, Linda Fletcher,[1] were involved in the Houston murders of Robert Banks and Robert Skeens. The grisly details of these brutal crimes are reported in detail in **Perillo v. State**, 758 S.W.2d 567, 568-69 (Tex. Crim. App. 1988). Only those facts relevant to our disposition will be paraphrased here.

Perillo met Briddle and his wife Fletcher in early 1980 through a mutual friend. Shortly thereafter, Perillo, Briddle, and another man robbed a gentleman who was a customer at the topless bar where Perillo worked in California. Briddle and Fletcher fled

---

[1] Fletcher's name at the time of the offenses was Linda Sutton Briddle. She married Fletcher after Briddle's trial, and later married Guitterez. Linda Sutton Briddle Fletcher Guitterez is most commonly referred to in the record as Linda Fletcher, the name she carried when she testified against Perillo. For ease of reference, this opinion adopts that convention.

California in order to avoid apprehension for the robbery. Perillo learned there was a warrant for her arrest and joined the couple en route in Tucson, Arizona. The trio found transportation with various truck drivers and eventually ended up in Houston, Texas. *See id*. at 568.

On the evening of Friday, February 21, 1980, victim Robert Banks stopped and offered them a ride. Banks, who was in the process of moving, also offered to compensate them if they would help him move. Briddle, Fletcher, and Perillo agreed. That night the trio stayed with Banks in his newly rented house. The following day, they helped Banks move some of his belongings, and then accompanied him to a rodeo. When they returned to Banks' home, they found Bob Skeens, a friend of Banks' from Louisiana, waiting for them. Skeens, who had arrived to help Banks move, was driving a green Volkswagen. The next morning, Banks and Skeens went to buy coffee and donuts. While Banks and Skeens were gone, Briddle and Perillo armed themselves with guns that belonged to Banks. *See id*. at 569.

When Banks and Skeens returned, Briddle and Perillo pulled the guns on them and told them to lay down. Skeens immediately complied but Banks, suspecting a joke, did not. Briddle struck Banks on the side of the head with the rifle, knocking him down and causing him to bleed. The victims were then bound with nylon rope. Skeens' ankles were later untied, and he was forced to walk to a back bedroom, where he was rebound. Sometime thereafter, a piece of rope was wrapped twice around Banks' neck, and he was strangled.

8

About an hour later, Skeens was killed in the same manner. Briddle, Fletcher, and Perillo loaded Skeens' Volkswagen with property belonging to Banks and Skeens and fled to Dallas, where they abandoned Skeens' car in a downtown parking garage and purchased bus tickets to Denver. Once in Denver, Briddle and Fletcher checked into one low-rent hotel and Perillo checked into a different low-rent hotel located nearby. *See* **id**.

On the evening of March 3, about one week after the crimes, Perillo turned herself in to the Denver police. Perillo then assisted police efforts to locate and apprehend Briddle and Fletcher at their Denver hotel. Early the next morning, Perillo voluntarily gave her statement to the Denver police. In that statement, Perillo claimed that she and her traveling companions "Arthur Day," later identified as Mike Briddle, and "Sheila Davis," later identified as Linda Fletcher, planned to rob and then kill the two victims for money. Perillo also stated that she and Briddle actually strangled the two victims, and that Fletcher was not in the room when the two victims were finally murdered.

The next day, Perillo gave a second statement, this time to Houston police. In her second statement, Perillo claimed that she committed both murders alone, and that Briddle and Fletcher did not stumble upon the crime scene until she had successfully subdued, tied, and strangled both Banks and Skeens. Perillo did not, however, ever sign the second statement.

**B.  Perillo's First Trial**

Briddle, Fletcher, and Perillo were all charged with capital murder.  Perillo's confession made hers the state's strongest capital case and she was called to trial first.  Perillo was represented by attorneys Robert Scott and William Burge.  Perillo told Scott prior to trial that, contrary to her confession, Fletcher had participated in Banks' murder by pulling on one end of the rope around Banks' neck.  Although Perillo was indicted for both murders, only Skeens' murder was submitted to the jury.  Neither Briddle nor Fletcher testified at Perillo's trial.  Perillo was convicted and sentenced to death.  In 1983, the Texas Court of Criminal Appeals reversed Perillo's first conviction and death sentence based upon error committed during voir dire.  *See **Perillo v. State***, 656 S.W.2d 78 (Tex. Crim. App. 1983).

**C.  Fletcher's Trial and Skelton's Continuing Relationship with Fletcher**

Meanwhile, Fletcher prepared for her trial with her attorney Jim Skelton.  Prior to trial, the state offered to let Fletcher plead guilty to non-capital murder.  Skelton declined the plea offer on Fletcher's behalf.  Eventually, the state reindicted Fletcher on two counts of aggravated robbery and dismissed the capital murder indictment.  Fletcher proceeded to trial on the two aggravated robbery counts in October 1980.

At Fletcher's trial, Skelton's strategy was to demonstrate Fletcher's innocence by placing all the blame on Perillo and Briddle.  Skelton argued that Fletcher came from a good background

10

and was a fundamentally different type of person than either Briddle or Perillo. Skelton emphasized, for example, that Fletcher's family was well-educated, and that Fletcher's relationship with Briddle began as the result of some sort of misguided sociological experiment. Skelton emphasized that both Perillo and Briddle came from mean circumstances, and that both Perillo and Briddle had prior criminal records. During closing argument, Fletcher's jury was presented with large photographs intended to dramatically illustrate the difference between the clean-cut and wholesome Fletcher, on the one hand, and the evil and hardened Perillo and Briddle, on the other hand. Fletcher did not testify at her own trial, and the state did not call either Perillo, whose appeal was pending, or Briddle, who was still resisting extradition from Colorado. The jury convicted Fletcher on both counts of aggravated robbery, but Fletcher was sentenced to only five years probation. Shortly thereafter, Fletcher returned to her home in California to serve out her probation and obtained an annulment of her marriage to Briddle.

After Fletcher's trial, Fletcher and her attorney, Skelton, stayed in contact with each other by written correspondence and with telephone calls. Skelton also developed a close relationship with Fletcher's mother. In July 1981, when Fletcher planned to remarry, Skelton was asked to come to California and give the bride away. Skelton agreed, and traveled to California to spend several days participating in the wedding festivities with Fletcher's family.

**D.** **Briddle's Trial and Skelton's Continuing Relationship with Fletcher**

In May 1981, Briddle was extradited to Texas.  While Briddle's case was pending, Skelton closely aligned himself with the interests of the victims' families.  Skelton encouraged the Banks and Skeens families to contact Fletcher about the crimes in order to obtain some closure and to explore their theory that there were more than three people involved in the murders.  At Skelton's urging and upon his advice, Fletcher spoke with members of the victims' families, including Skeens' grieving mother, who even traveled to California at one point to meet with Fletcher about the crimes.

In 1982, when it came time for Briddle's trial, Skelton was instrumental in securing Fletcher's testimony for the state.  The state did not subpoena Fletcher.  Rather, Skelton strongly encouraged Fletcher to volunteer her testimony against Briddle.  Skelton has testified that everyone involved, including Skelton and Fletcher, wanted to see Briddle get the death penalty.  Skelton instructed Fletcher that she owed it to her country and to the victims to appear against Briddle.

Skelton then represented Fletcher in her negotiations with the state concerning her testimony against Briddle.  Although Briddle's individual prosecutors held the view that Fletcher's trial on the lesser included offense of aggravated robbery would preclude her subsequent prosecution on the capital murder charges, Skelton felt this was an open legal question, and insisted that Fletcher be

12

granted immunity in exchange for her testimony against Briddle.

The exact type of immunity that Skelton negotiated for Fletcher's testimony against Briddle, whether "use" immunity or the much broader "transactional" immunity, remains unclear. *See Perillo I*, 79 F.3d at 444 (explaining the difference between use immunity and transactional immunity). In a prior appeal of this matter, this Court relied upon a letter from the D.A.'s office that describes Fletcher's immunity at Briddle's trial in a manner suggesting that only use immunity was being granted. That evidence was consistent with the Director's briefing, which stated that Skelton had negotiated only use immunity in exchange for Fletcher's testimony against Briddle. *See Perillo I*, 79 F.3d at 448. On remand, however, the basic premise that Fletcher had only use immunity at Briddle's trial has been seriously undermined.

Briddle's trial record reflects that the state entered into a prosecutorial agreement that Fletcher would receive immunity from further prosecution in exchange for her testimony against Briddle. That immunity is characterized in the record as "absolute judicial immunity for any transactions." Although Fletcher testified that an unnamed judge granted the immunity, there is no documentary evidence that the grant of immunity was ever formalized. The record reflects that such grants would need to be (1) approved by District Attorney Johnny Holmes, (2) presented in petition form to the state trial judge, and then (3) enacted by order of the state trial court. *See Graham v. State*, 994 S.W.2d 651, 656 (Tex. Crim. App.) (citing *Carlisle v. State*, 137 S.W.2d 782 (Tex. Crim. App.

13

1940) for the proposition that a prosecutorial agreement not to prosecute is not binding absent court approval), *cert. denied*, 120 S. Ct. 420 (1999).  Moreover, it is evident from the questions raised by Briddle's trial judge that the trial court did not have any documentary evidence demonstrating that Fletcher had been judicially granted transactional immunity in exchange for her testimony.

The district court found that the evidence clearly and unambiguously established that Fletcher was granted full transactional immunity before her testimony against Briddle.  For the foregoing reasons, we conclude that the evidence is insufficient to support that factual determination.  The evidence relied upon merely reflects the state's position: (1) that it did not intend to prosecute Fletcher, (2) that Fletcher's prior conviction for the lesser included offense of aggravated robbery would have precluded its further prosecution of Fletcher, and (3) to the extent there was any remaining doubt, that the state had entered into a prosecutorial agreement to provide Fletcher with absolute immunity from prosecution for the underlying offenses, by stating that fact on the record.  Despite Skelton's best efforts, the record does not definitively reflect that Fletcher unambiguously enjoyed complete and binding transactional immunity, as opposed to merely a prosecutorial agreement not to prosecute. *See* **Graham**, 994 S.W.2d at 654-56.  The conclusion that there remained some ambiguity as to Fletcher's status is further supported by Skelton's recollection in this proceeding that the

14

state had granted only use immunity with respect to Fletcher's Briddle testimony. Without regard to whether Fletcher testified against Briddle pursuant to use or transactional immunity, the record is clear and the Director concedes that the agreement Skelton negotiated for Fletcher would not have protected her from perjury charges if her testimony was later proven false.

Prior to testifying, and while represented by Skelton, Fletcher gave a lengthy statement to prosecutors recounting her version of the events leading up to and following Banks' and Skeens' murders. At Briddle's trial, Fletcher repeated many of the details contained in her statement, and was the "State's chief witness" against Briddle. *Briddle v. Scott*, 63 F.3d 364, 366 (5th Cir. 1995). Fletcher's testimony added otherwise unknown details to the body of evidence which virtually ensured the death sentence. Significantly, Fletcher's testimony also cast Perillo in an equally unfavorable light. Fletcher's testimony highlighted Perillo's criminal history and portrayed Perillo as heartless and completely without remorse. Fletcher testified that it was Perillo who first suggested killing Banks, and that it was Perillo who repeatedly brought the subject up, urging Briddle to help her murder Banks. Fletcher also testified that she was outside in the car when the murders took place, and that she did not participate in the murders of the two men.

Skelton appeared at Briddle's trial as Fletcher's lawyer. When Fletcher was called to testify, Briddle's trial counsel sought to have Skelton sworn and excluded under the rule. The prosecution

15

argued that Skelton, as Fletcher's attorney, was exempt from the rule. Alternatively, Briddle's trial counsel wanted Skelton admonished not to discuss the facts of the case with Fletcher. The defense position was that there was no longer any attorney-client relationship between Skelton and Fletcher given the conclusion of Fletcher's own trial. Both Skelton and the prosecutor objected on the record. The prosecutor argued that the attorney-client relationship between Skelton and Fletcher was properly continuing, notwithstanding the fact there were no pending criminal proceedings against Fletcher. Skelton likewise argued that he could not be precluded from discussing the case with Fletcher because she was his client. Although Skelton was at one point asked to remain outside, Briddle's trial judge changed course in response to Skelton's and the prosecution's objections, and there is no indication that Skelton left the court room at that time.

While Fletcher was in Houston to testify for the state against Briddle, she stayed with Skelton for between seven and ten days in his one bedroom condominium. Fletcher stayed past the time that her testimony was complete, and did not return home until the verdict against Briddle was in. Briddle was sentenced to death and has since been executed. Fletcher has testified that she was "pleased" with the result of Briddle's trial.

**E.  Perillo's Second Trial and Skelton's Continuing Relationship with Fletcher**

*1.  Skelton's Concurrent Representation of Fletcher During Perillo's Second Trial*

Eventually, Perillo's case was scheduled for retrial. The

16

court appointed attorney Robert Pelton to represent Perillo. Pelton had never tried a capital case before, but he ran several machine shops with a more senior lawyer, Jim Skelton. Pelton asked Skelton to join Perillo's defense, and in November 1983, Skelton was likewise appointed to represent Perillo. Skelton's first instinct upon being appointed was to call Fletcher to "alert her" that he would be handling Perillo's case.

Skelton did not similarly "alert" Perillo concerning the circumstances of his prior representation of Fletcher. In particular, Perillo was not made aware that Skelton's strategy at Fletcher's trial was to pin the blame on Perillo and Briddle and to develop evidence making them look as bad as possible, that Skelton had an ongoing personal friendship with Fletcher of such a nature that Skelton gave Fletcher away at her wedding, that Skelton had aligned himself with the victims' interests and encouraged Fletcher to meet with the victims to answer their questions about the crimes, that Skelton had negotiated a grant of immunity for Fletcher in exchange for Fletcher's damaging testimony against Briddle, that Skelton continued to represent Fletcher during Briddle's trial, or that Fletcher's preserved testimony at Briddle's trial alleged new and damaging details about Perillo's own conduct. To the contrary, Perillo knew nothing more than that Skelton had secured a very favorable sentence for Fletcher and that she hoped he would be able to do the same in her case.

Jury voir dire began in Perillo's second trial on October 8, 1984. On October 19, 1984, Perillo's trial judge issued a subpoena

17

to compel Fletcher, who was still living in California, to return to Texas. Once again, Skelton's first impulse was to call Fletcher to alert her about the subpoena. Fletcher did not want to testify because she wanted to "put all this" behind her. She asked Skelton to come to California to represent her in her efforts to quash the subpoena. Skelton left, during the pendency of Perillo's trial, and went to California at Fletcher's request. While in California, Skelton went to Fletcher's home to meet with Fletcher and her husband about Fletcher's potential testimony.

Skelton and Fletcher have testified consistently that Skelton was providing legal counsel to and representing Fletcher in the California hearing. Skelton argued on Fletcher's behalf that she should not have to return to Texas. Fletcher testified that it occurred to her at the time that Skelton might be in a conflict of interest situation based upon his prior representation of her at trial and his concurrent representation of she and Perillo in California. Fletcher further testified that she at no time had the impression that Skelton was in California to represent Perillo. Rather, she considered him to be there as her lawyer.

Perillo's prosecution team filed documents in support of the subpoena, including a statement prepared by the state trial court judge that Fletcher's testimony was considered necessary in Perillo's case. Fletcher has testified that she believed at the time of the California hearing that she could still be prosecuted if she were to return to testify against Perillo. The state prepared correspondence stating that, if Fletcher would return to

18

testify against Perillo, the state would "again" seek a grant of transactional immunity in exchange for her testimony. Although there is no record evidence suggesting that Skelton, or even Fletcher, negotiated that renewed grant of immunity, the offer of renewed immunity was made at a time when Skelton was simultaneously representing Fletcher and Perillo. Without regard to which grant of immunity (the Briddle immunity or the Perillo immunity) was controlling, the record is clear that Fletcher could have been prosecuted for perjury if her testimony were proven materially false.

The record reflects that when prosecutors went looking for the previous grant of transactional immunity relative to Briddle's trial, they were unable to find it. The record further contains: (1) a written request that immunity be granted, which is signed by district attorney Johnny Holmes, and (2) court pleadings petitioning the court for an order granting Fletcher immunity. The court pleadings are not, however, signed by any judicial authority. *See* **Graham**, 994 S.W.2d at 654-56. As a consequence, the technical status of Fletcher's immunity when she returned to testify against Perillo is likewise unclear. At a minimum, however, Fletcher was the beneficiary of a prosecutorial promise not to prosecute that arose either from Skelton's negotiation of Fletcher's immunity before the Briddle trial, or from the state's renewed offer of immunity at a time when Skelton was representing both Fletcher and Perillo in California.

The California court ordered Fletcher to testify, and Skelton

19

did not appeal or otherwise challenge that ruling. Skelton views his concurrent representation of Fletcher and Perillo as without conflict because Perillo likewise had an obvious and compelling interest in keeping Fletcher in California. The record reflects, however, that the California order directing Fletcher's return, and indeed the state's request for Fletcher's return, did not pose any difficult issues. Indeed, Perillo's prosecutors testified in this proceeding that, where the state was paying for her return, the state was confirming the availability of immunity, and Fletcher was a direct witness to the events leading to a capital murder, the California order directing her return was expected, and indeed almost pro forma.

The apparent inevitability that Fletcher would be ordered to return raises a serious question about the extent to which Perillo, as opposed to Fletcher, would even potentially be benefitted by Skelton's services in California. Moreover, that apparent inevitability should have brought home to Skelton the fact that his two clients' interests, should Fletcher be ordered to return, would rapidly diverge. Fletcher's primary interest would be in avoiding further prosecution. To do so, she would need to testify in a manner consistent with the damaging details revealed in her Briddle testimony in order to avoid being charged with perjury or invalidating the immunity agreement that was either negotiated by Skelton or secured while he represented her. Perillo would need to undermine Fletcher's credibility and impeach Fletcher's testimony by any means possible, in order to minimize the effect of

20

Fletcher's damaging testimony. Perillo would also need to emphasize Fletcher's own involvement in order to highlight the disparity between Fletcher's punishment of five years probation and a potential death sentence in Perillo's case.[2]

### 2. Fletcher's Testimony Against Perillo

Fletcher returned to Houston to testify against Perillo on November 5 or 6, 1984. Although Fletcher initially stayed at a hotel arranged by the state, she moved to Skelton's condominium shortly thereafter, and stayed with Skelton throughout the duration of Perillo's trial.

On the afternoon that Fletcher arrived in Houston, Skelton arranged to have her meet with another criminal defense attorney, Will Gray, with whom Skelton shared office space. Skelton has

---

[2] The district court made several fact findings with regard to Skelton's agreement to represent Fletcher in California during the course of Perillo's trial and after Fletcher had been named as a potential witness for the state. Specifically, the district court found that Skelton went to California, with Perillo's knowledge, primarily for the purpose of representing Perillo's interests, and only coincidentally to represent Fletcher's interests. The district court also held that Perillo's and Fletcher's interests with respect to Skelton's concurrent representation in California were identical because both women wanted to avoid the subpoena for Fletcher's testimony at Perillo's trial.

We are unable to affirm the district court's factual determinations on these issues. While Perillo knew Skelton was going to California, she did not know the true character of Skelton's prior representation of Fletcher and did not understand the potential for conflict should Fletcher be ordered to return. Further, although both Fletcher and Perillo wanted to avoid the subpoena, they wanted to do so for different reasons. The record demonstrates that the possibility of avoiding the subpoena was small and the risk of an ensuing conflict should Fletcher be ordered to return was large. We therefore reject the district court's determination that Fletcher and Perillo's interests with respect to the California proceedings were identical.

testified that the sole purpose of this consultation was to seek Gray's advice concerning whether the attorney-client relationship that had existed between Skelton and Fletcher might be used in some manner to exclude or limit the effect of Fletcher's testimony against Perillo. Skelton denies that Gray was consulted regarding any conflict of interest arising out of his prior and concurrent representation of Fletcher.

Fletcher only met with Gray once, on the afternoon before she began her testimony against Perillo on November 7, 1984. Skelton dropped Fletcher off and picked her up from the meeting. Gray has testified that his meeting with Fletcher left him thinking that there was a distinct possibility that Fletcher would be charged with perjury unless she asserted the attorney-client privilege at Perillo's trial. Gray was also concerned about the conflict of interest arising from Skelton's simultaneous relationship with both Fletcher and Perillo. After meeting with Fletcher, Gray told Skelton that Skelton should withdraw from Perillo's case. Gray agreed, however, to appear on Fletcher's behalf when she testified the next day.

That night Skelton and Fletcher returned to Skelton's condominium alone and had a lengthy conference during which Skelton refreshed Fletcher's recollection of her testimony against Briddle by going through her prior testimony, which Skelton characterized as "set in stone," with Fletcher. Skelton also "mapped out" for Fletcher exactly what he intended to ask her during his cross-

examination of her at Perillo's trial the next day. Gray, Fletcher's putative attorney, was not present for this briefing session.

Skelton claims that this evening conference at his home was the first time he ever discussed Fletcher's version of the facts with her. Skelton claims he did not discuss the facts of the case against Fletcher with her before or during her own trial, when referring the victims' families to her, when he attended at her wedding, when he negotiated Fletcher's immunity for Briddle's trial, when Fletcher gave a statement to prosecutors detailing those facts before Briddle's trial, when she stayed with him for more than one week during Briddle's trial, when he appeared on her behalf at Briddle's trial, when he represented her in California during the course of Perillo's trial, or at any other time prior to that evening. Skelton's testimony in this regard is, as the district court ultimately found, both incredible and contradicted by other evidence.

Without regard to whether Skelton discussed the facts of Fletcher's case with her prior to the evening before her Perillo testimony, Skelton concedes that he did discuss the facts with Fletcher that evening. Thus, Skelton met with Fletcher, the state's star witness, the night before she testified against Perillo for the purpose of permitting Fletcher the opportunity to conform her testimony against Perillo to her prior, and very damaging, testimony in Briddle's trial, and for the purpose of affording Fletcher a preview of Skelton's cross-examination on

23

Perillo's behalf. The record reflects that several individuals were concerned about the conflict of interest problems presented by Skelton's dual relationship with both Fletcher and Perillo. In addition to Gray, there is evidence that Perillo's prosecutors were concerned about the conflict of interest arising out of Skelton's dual relationship with Fletcher and Perillo. As mentioned above, there is evidence that Fletcher was concerned about a conflict of interest. Finally, there is evidence that Skelton himself was concerned about the conflict of interest arising from Skelton's relationship with both Fletcher and Perillo. Skelton asked criminal defense attorney Will Gray, who had extensive experience defending capital cases, to consult with Fletcher. Although Skelton testified that Gray's consultation was exclusively for the purpose of seeing whether Fletcher's testimony could be excluded altogether, both Gray and Fletcher testified that Gray was supposed to consult with Fletcher about any actual conflict that might infringe upon her rights, given Skelton's representation of both Fletcher and Perillo.

Notwithstanding Gray's advice, Skelton continued with Perillo's case, and the next day Fletcher appeared to testify against Perillo. Although not introduced during the evidentiary hearing on remand, the record contains sworn affidavits from two individuals, one a member of the bar, stating that they were either party to or overhead a conversation during Perillo's trial in which Skelton said that he had advised Fletcher to lie in Briddle's trial, and that Fletcher would therefore be compelled to repeat her

24

lies in Perillo's trial, although Skelton planned to spin Fletcher's lies in a way that would help Perillo.[3]

Once Fletcher was called to the stand, the state asked Fletcher some questions which the prosecutor has subsequently testified were intended to address the issue of whether Skelton's representation of Perillo was burdened by a conflict of interest arising from his relationship with Fletcher. Fletcher testified that there was no longer any attorney-client relationship between her and Skelton. Gray then interjected, stating that he represented Fletcher, that Fletcher had been granted immunity for her testimony, and that the extent of his counsel to Fletcher was that she assert the attorney-client privilege where applicable.

Gray was never formally appointed to represent Fletcher. Once Fletcher began testifying, and it became clear that she would not follow Gray's advice to assert her attorney-client privilege, Gray left the courtroom, and did not stay to hear Fletcher's testimony or to otherwise protect her interests. There is no indication that Gray ever had any other contact with or exposure to Fletcher. Gray has testified in this proceeding that he feels there was an actual conflict arising from Skelton's multiple representation of both Fletcher and Perillo. While Gray does not ascribe any improper motive to Skelton in doing so, Gray believes that Skelton inappropriately "got caught up in trying to serve two masters."

Tellingly, neither the prosecutors nor Gray nor Perillo's

---

[3] One of those witnesses testified that Skelton also claimed to have procured a "phony annulment" for Fletcher so that she could testify against her former husband, Briddle.

25

trial judge elicited from Fletcher the full scope of Fletcher's relationship with Skelton. Although the fact of Skelton's prior representation at Fletcher's trial was stated in the record, no one questioned Fletcher about Skelton's representation after Fletcher's trial, at Briddle's trial, or after Perillo's trial began. Those facts were simply not developed, leaving both Perillo's trial judge and Perillo herself in the dark. Skelton did not, as he had for Fletcher, arrange for Perillo to consult with any independent counsel regarding the existence of a conflict of interest. Indeed, neither the trial judge nor the prosecutors nor Skelton expressed any interest in determining whether Perillo was aware of Skelton's relationship with Fletcher or whether Skelton's dual relationship with both Fletcher and Perillo might have any conflict of interest implications that would impair Skelton's presentation of Perillo's defense.

On direct, Fletcher repeated the damaging testimony given at Briddle's trial. Fletcher's testimony tended to establish both Perillo's guilt and her future dangerousness by describing extraneous offenses that were neither contained in Perillo's confession nor otherwise offered into evidence by the state. Fletcher's testimony also tended to establish that Perillo was heartless and cruel. For example, Fletcher testified that Perillo used a tape recorder taken from Banks' house to make mocking recreations of the murders. Fletcher also elaborated on her earlier Briddle testimony without objection from Skelton. For example, Fletcher testified at Perillo's trial, but not at

26

Briddle's trial, that Perillo had calmly demanded her share of the money from the robbery as the trio fled Houston. Fletcher also elaborated on her testimony that Perillo was using Banks' tape recorder on the bus to Denver by testifying that Perillo was making statements like "the rope is too tight," and "I don't like looking at your face, its turning blue" while Briddle laughed.[4] There can be little doubt that Fletcher's testimony was "most damaging" to Perillo. *Perillo*, 758 S.W.2d at 572.

On cross-examination, Skelton's continuing obligation to Fletcher, arising in part from his role in securing Fletcher's damaging Briddle testimony and the grant of immunity in her favor, and as complicated by his decision to refresh Fletcher's recollection of her prior testimony and his decision to preview his cross-examination with Fletcher, obviously hindered Skelton's ability to challenge or minimize Fletcher's testimony in any meaningful way. Skelton led Fletcher through her testimony so consistently that the transcript reads as though Skelton himself is testifying. Throughout the lengthy cross-examination, Fletcher gave predominantly one word responses to the lengthy, compound questions posed by Skelton.

Skelton began by going through some of the lengthy history of his personal and professional relationship with Fletcher. Skelton

---

[4] The district court found that Fletcher gave "substantially the same testimony that she had given at the trial of Briddle." While we do not necessarily disagree with that finding, we do find some significance in the fact that Fletcher's testimony at Perillo's trial included damaging new details that came in unchallenged by Skelton.

27

disclosed that Fletcher had received a five year probated sentence for her involvement in the crimes. Skelton diminished Fletcher's own involvement by pointing out that Perillo's own statements "left [Fletcher] out of it." Skelton identified himself and Fletcher with both the government and the victims' families by eliciting her testimony that she volunteered her testimony at Briddle's trial because it was the right thing to do and that, at his urging, she had met with the victims' families. Skelton bolstered Fletcher's credibility by eliciting testimony about her excellent background, including her well-educated sisters, her supportive family, and even her high school grade point average.

Skelton then proceeded to Fletcher's version of the facts. Fletcher repeated much of the damaging testimony given on direct. Skelton failed to ask questions that might have impugned Fletcher's credibility or exposed any ulterior motives for her testimony, although he could have fruitfully pursued both avenues. *See* *Perillo I*, 79 F.3d at 451 n.12. Skelton failed to point out that Fletcher's prior statement to Denver police that she had last seen Banks alive and well when he dropped her off on the freeway was inconsistent with her testimony at Perillo's trial. *See* *id*. Skelton failed to point out that Fletcher might hold a grudge against Perillo because Perillo turned both Fletcher and Briddle in to the police. *See* *id*. Skelton failed to explore the import of Fletcher's desire to "put all this" behind her, which might have included a motive to eliminate the one remaining person who could remind her of and shed light upon Fletcher's own involvement in the

28

murders.  Skelton also failed to ask Fletcher questions that would have incriminated her, or at least called into question whether she was more involved in the murders than she claimed.  For example, Skelton failed to ask Fletcher about the fact that she had blood on her pants when she was arrested.  *See id*.[5]

Notwithstanding the fact that Skelton previewed his cross-examination with Fletcher the night before, he also asked questions that tended to incriminate Perillo.  For example, Skelton's cross-examination elicited damaging evidence of Perillo's involvement in a host of extraneous offenses not otherwise developed by the state.  *Id*.  For example, Fletcher testified that Perillo was heavily involved with drugs, and that Perillo generally helped Briddle with his "robberies."  Fletcher also offered new details with regard to the robbery that led the trio to flee California.

Skelton also elicited false testimony from Fletcher that operated to prejudice Perillo's defense.  For example, Fletcher testified that she did not receive any benefit from the state in exchange for her testimony against Briddle.  As developed *supra*, Fletcher received at least use immunity, and probably full

---

[5]    Skelton also failed to clarify misleading testimony concerning the fact that the only usable print recovered in the course of the investigation was Fletcher's fingerprint, leaving the jury to conclude instead that the print belonged to Perillo.  The district court chose not to rely upon this factor in its decision, stating that the record did not support the premise that the print evidence provided a basis for cross-examination of Fletcher.  While we find some significance in Skelton's failure to clarify the misleading testimony, we cannot say that the district court's resolution of this factual issue is clearly erroneous.  For that reason, we will exclude consideration of this factor in our decision.

29

transactional immunity, in exchange for her testimony against Briddle. In addition, Skelton elicited testimony from Fletcher that he was not present when she appeared at Briddle's trial, a statement that is flatly contradicted by the record in Briddle's case. Skelton has testified that his trial strategy was to try and make both Fletcher and Perillo look like victims who were being manipulated by an evil and controlling Briddle. Skelton planned to compare Fletcher's outstanding background with her despicable conduct when married to Briddle in order demonstrate the strength of Briddle's influence. But Skelton elicited testimony that was both damaging to Perillo and inconsistent with his stated strategy. For example, Fletcher testified that she was crying and visibly distraught throughout the time the robbery and murders were taking place. But, notwithstanding the fact that Skelton previewed his cross-examination with Fletcher, Skelton elicited Fletcher's testimony that Perillo was calm and "methodical" (Skelton's word) during the offenses. Similarly, Fletcher testified that Briddle forced her to engage in prostitution for his benefit and that he frequently beat her when she tried to refuse. Fletcher then testified that Perillo refused to engage in prostitution for Briddle's benefit without consequence, and that Briddle never attempted to harm Perillo.

Perillo's prosecutors have testified that they were worried that Fletcher's testimony on cross-examination that she received only a five year probated sentence might influence the jurors to likewise impose a lighter sentence than death on Perillo. This is

30

the prosecutors' attempt to make Skelton's approach to Fletcher's cross-examination seem wise, or at least professionally reasonable. But as Perillo's counsel pointed out in the evidentiary hearing, any strategy to highlight the light sentence Fletcher received by comparison can only have been strengthened by a vigorous cross-examination calling into question whether Fletcher was in fact more involved in the offenses than she pretended. The fact that both women pulled on the rope that killed Bob Banks could only have added to the obvious disparity between the five year probated sentence in Fletcher's case and the death penalty being sought in Perillo's case. Such evidence would also have furthered Skelton's stated trial strategy by strengthening the contrast between Fletcher's background and her conduct under the influence of Briddle.

Perillo claims, and neither Skelton nor his co-counsel Pelton disputes, that she made a contemporaneous and vociferous objection to counsel when Skelton was cross-examining Fletcher at trial. Perillo claims she told both Skelton and Pelton that Fletcher was lying and that Fletcher was inaccurately portraying Perillo as the ringleader to cover her own more substantial involvement. As just one example, Perillo testified in the evidentiary hearing that, contrary to her prior confessions, Fletcher pulled on one end of the rope that strangled Bob Banks. The fact that she did not make this theory up for habeas review is corroborated by the testimony of Robert Scott, who represented Perillo at her first trial. Scott testified that Perillo told him the same story about Fletcher's

31

active involvement prior to her first trial.

Perillo claims that she asked Skelton to cross-examine Fletcher about her lies, but Skelton refused. He just patted Perillo's hand and told Perillo it would be okay. Perillo also says that she told her lawyers she wanted to testify in order to clarify for the record that Fletcher was lying. Perillo claims that Skelton and Pelton refused to allow her to testify. Skelton told Perillo that it was important for Fletcher to testify in a manner that was consistent with her Briddle testimony. The acrimony arising from these events and others is evidenced in Perillo's trial record, which includes Perillo's post-trial and pro se motions to remove Skelton and Pelton from her case.

Skelton called only one witness during the guilt phase of Perillo's trial. Skelton called Houston Police Officer West, who took Perillo's second and unsigned statement, in which she claimed that she committed both murders alone. Perillo's second, unsigned statement was recognized as inadmissible and therefore not introduced at Briddle's trial. Prior to West's testimony for the defense, Perillo's second statement had not been introduced into evidence or otherwise discussed at Perillo's second trial. Skelton asked Officer West a few questions to establish that he took the statement and then, inexplicably, had Officer West read the entire lengthy statement, which was highly incriminating as to Perillo and equally exculpatory as to Fletcher, verbatim into the record. West's testimony was the last evidence received before closing arguments and submission to the jury.

32

At the close of evidence in the guilt phase, Skelton told the jury that defending Perillo was one of the most difficult jobs he has ever had to do because of his close relationship with the victims' family, and because of the horrendous and disturbing brutality of the crimes. Skelton told the jury that his hair stood on end when he read the state's file, and found out the trio began planing the offenses the night before the crimes while at the rodeo with Banks.[6] Not surprisingly, the jury returned a verdict of guilty.

During the punishment phase, the state called the victim of the California robbery, and two police officers who testified that Perillo's reputation for peaceableness was bad. Skelton and Pelton called numerous witnesses who testified to Perillo's pitiful family background, Perillo's religious conversion in prison, and Perillo's prospects for support from the community should she be spared the death penalty. In his closing argument, Skelton told the jury that he cared a great deal about the victims in this case, as evidenced by the fact that he was responsible for securing the testimony that ensured Briddle received the death penalty. Skelton told the jury that the sole issue in Perillo's trial had always been punishment, rather than guilt. Skelton emphasized that Perillo was remorseful, and that she deserved some credit for turning the trio in to the police. Skelton closed with a plea for mercy. Thereafter, the

---

[6] We note that the only source of that information would have been Fletcher's pretrial statement or her testimony at Briddle's trial, which Skelton claims he never read or reviewed until the night before Fletcher testified.

33

jury returned affirmative answers to the two special issues required for imposition of the death penalty.

Skelton has testified that there was no conflict of interest arising from his dual relationship with both Fletcher and Perillo because Fletcher would have done anything, even lied on the stand, to help Perillo. But Fletcher's own testimony in this proceeding contradicts that premise; Fletcher has testified that she was "pleased" with the outcome of Perillo's trial and does not care whether Perillo gets the death penalty. Fletcher's candid admission of her point of view tends to support Perillo's belief that Fletcher's testimony was intended to and did secure her conviction and condemn her to death.

## F.   Perillo's Direct Appeal and State Habeas Proceeding and Skelton's Continuing Relationship with Fletcher

Perillo's conviction and sentence were affirmed on appeal. *See Perillo v. State*, 758 S.W.2d 567. In November 1991, Perillo filed a state habeas corpus action in the convicting court. Skelton continued to represent Fletcher during the course of Perillo's state habeas proceeding. In 1992, Perillo's habeas counsel attempted to contact Fletcher to investigate the facts surrounding Skelton's representation of Fletcher. Fletcher initially agreed to an interview, but then canceled on the advice of her counsel, Skelton. Fletcher told Perillo's habeas counsel that all future communications had to go through Skelton, and that if necessary, Skelton would fly to California to resist any subpoena for Fletcher's testimony. Skelton never responded to Perillo's habeas counsel's attempts to contact him directly.

34

In January 1994, the state court judge, who was not the judge who presided at Perillo's trial, entered written findings of fact and conclusions of law, recommending denial of Perillo's writ. The state habeas court's disposition relied heavily upon the credibility of Skelton's affidavit testimony. Perillo's state habeas petition was later denied by the Texas Court of Criminal Appeals in an unpublished per curiam opinion. *See **Ex parte Perillo***, No. 26,367-01 (Tex. Ct. Crim. App. 1994).

The state habeas court did not conduct an evidentiary hearing, and decided the case instead on the basis of the affidavits and other documents submitted to the court. *See **Perillo I***, 79 F.3d at 445-47. We have already determined that Perillo did not receive a full and fair hearing on her Sixth Amendment claim in the state habeas court. *See **id**.* at 445-46 & n.7 (explaining the significance of the "paper" hearing in Perillo's case with respect to the presumption of correctness to be accorded the state court fact findings). The evidence received on remand, particularly the evidence relating to Skelton's credibility, strongly supports that legal conclusion. Further, the procedural posture of this present appeal does not affect our prior resolution of that legal issue. We therefore adhere to our earlier holding that, on the particular facts of this case, the state habeas court's fact findings are not entitled to the presumption of correctness provided for in the pre-AEDPA version of 28 U.S.C. § 2254(d).

**G.   Perillo's Federal Habeas Corpus Petition and Skelton's
Continuing Relationship with Fletcher**

Perillo filed this, her first federal habeas, on May 4, 1994.
Perillo's petition is controlled by pre-AEDPA law because it was
filed before the effective date of AEDPA, *see Lindh v. Murphy*, 117
S. Ct. 2059 (1007), and because Texas has not opted into the
separate provisions of AEDPA making the statute retroactive for
death penalty cases, *see Green v. Johnson*, 116 F.3d 1115, 1120 (5th
Cir. 1997).   In August 1994, without permitting discovery or an
evidentiary hearing, the district court granted summary judgment in
favor of the Director and denied relief.   The district court's
disposition of Perillo's claim, like that of the state habeas
court, relied heavily upon the credibility of Skelton's affidavit
testimony.   Perillo appealed.

### 1.   The Prior Appeal

On appeal, this Court was particularly concerned about the
fact that Perillo had not been given an opportunity to develop her
claim, either in the state habeas court or the federal habeas
court.   We noted that "Perillo has not had the opportunity to
depose or cross-examine Skelton.  Perillo has not even been able to
get Fletcher's affidavit."  *Perillo I*, 79 F.3d at 445.   We were
also disturbed by the fact that Skelton continued to be "Perillo's
chief obstacle in obtaining information from Fletcher," as well as
by the tone of Skelton's vitriolic and unprofessional affidavits.
*Id.*[7]

---

[7]     We quoted only a small portion of Skelton's affidavit
testimony in our prior opinion.  *See Perillo I*, 79 F.3d at 445 n.4.

36

Perillo argued that Skelton's prior and concurrent representation of Fletcher gave rise to an actual conflict that adversely affected Skelton's interests, either during Skelton's concurrent representation of Fletcher in California or during Skelton's cross-examination of Fletcher at Perillo's trial. We agreed, holding that Perillo had not received a full and fair hearing of her claim in the state habeas court, *see* **Perillo I**, 79 F.3d at 445-46 & n.7, and that Perillo had alleged facts which, if proven true, would entitle her to relief, *see* **id**. at 447-51. Accordingly, we vacated the judgment of the district court and remanded for discovery and an evidentiary hearing. *See* **id**. at 451.

### 2. *Proceedings on Remand*

#### a. *The first evidentiary hearing and decision*

The district court held its first evidentiary hearing on November 25 and 26, 1996. The Court heard evidence from Skelton, Fletcher (by video), Scott (Perillo's counsel at her first capital murder trial), Gray (Fletcher's putative counsel for conflicts at

---

That excerpt was by no means the most callous portion of his affidavit testimony. But Skelton's affidavit, for all its crude language, reveals a good bit about Skelton's conflicted position at Perillo's trial. Skelton states that Fletcher's testimony was "set in stone," and that it was important that she testify consistently at Perillo's trial, without omitting any of the facts that might hurt Perillo's case. Skelton describes Fletcher affectionately as being "very popular" and the "clown" of an upstanding middle class family. Skelton emphasizes that Fletcher was never in trouble with the law prior to her affiliation with Briddle, which only occurred as the result of a misguided college project. Skelton describes Perillo and her participation in the offenses, on the other hand, in the coarsest possible terms, stating, for example, that "[t]hinking that impeaching Linda would save Perillo makes as much sense as attempting to convince the jury that the rope accidentally 'went off,' flew across the room, and strangled both men to death."

Perillo's trial), Perillo, Bill Warren (Perillo's expert on conflict law), Pelton (Skelton's co-counsel for Perillo's second capital murder trial), Crowley (lead prosecutor for Perillo's second capital murder trial), and Gotshall (junior prosecutor for Perillo's second capital murder trial), all of whom testified to the facts developed *supra*. In addition, both sides offered a substantial amount of documentary evidence in the form of exhibits.

Skelton repeated his affidavit testimony that there could be no actual conflict because Fletcher wanted to help Perillo, and no adverse effect because demonstrating Fletcher's culpability in the crime, i.e. "that Linda was a lying California bitch who tugged on the rope with Perillo," would not have saved Perillo from the death penalty. Skelton's basic premise was that the quality of his advocacy was immaterial because Perillo's confession was insurmountable. Post-hearing briefs were filed by both parties.

On August 5, 1997, the district court entered an order denying habeas relief. The district court relied heavily upon Skelton's testimony, expressly finding that Skelton's testimony was credible. The district court further agreed with Skelton that no "amount of hostility toward or discrediting of Fletcher could have diminished, much less neutralized, the compelling force of Perillo's own confession." In so holding, the district court seems to have confused **Strickland**'s standard, which requires a showing of actual prejudice with respect to the outcome of the trial and **Cuyler**'s less stringent standard, which places the focus upon whether

38

counsel's performance was compromised by an actual conflict of interest.

### *2.    The second evidentiary hearing and decision*

On August 19, 1997, Perillo filed a motion to reopen the evidence and for reconsideration. The primary issue at this point was Skelton's credibility. Skelton's credibility was key to such important issues as whether Fletcher had in fact conveyed any confidential information to Skelton when he represented her, and whether Skelton knew that Perillo's version of the facts implicated Fletcher in the actual murders, a fact which might have aided Perillo's defense, but would almost certainly have opened Fletcher up to perjury charges. Perillo pointed out that Skelton's testimony conflicted with that of other witnesses, including Robert Scott and Will Gray, and with documents admitted into evidence. Perillo also pointed out that Skelton was disbarred for lying to a client the day after the district court's decision relying upon Skelton's credibility to deny relief.

Perillo tendered evidence that Skelton's August 1997 disbarment resulted from his decision to lie to a client about the status of the client's criminal appeal from federal conviction. Unfortunately for Skelton, the client tape recorded Skelton's assertions that the client's appeal was pending, that Skelton had presented oral argument to an interested Fifth Circuit panel, and later, that the client's conviction had been affirmed on appeal. In fact, the client's appeal had been dismissed for want of prosecution months before Skelton began telling the client about

the fictitious oral argument and affirmance. There are tape recordings of these conversations in the record. Even when the client confronted Skelton about the appeal being dismissed months before, Skelton told the client he had attended oral argument and that some unidentified lawyer named "Greg" must have dropped the ball. Perillo argued that the newly discovered evidence was highly probative with respect to Skelton's credibility. Perillo also reargued her substantive arguments for relief.

In March 1998, the district court granted Perillo's motion to reopen the evidence and for reconsideration. In the same order, the district court vacated its earlier judgment denying relief. The district court again granted discovery and set a second evidentiary hearing for May 21, 1998. At this hearing, Skelton admitted that he lied to his client about the appeal made the subject of the disciplinary proceedings against him. The two tape recorded conversations were played. Skelton also testified that there are times when you cannot be truthful with a client. Skelton had previously testified to the same effect in another disbarment proceeding, in which Skelton offered testimony defending another lawyer who delayed telling a criminal defendant that charges had been dropped for a number of months to keep leverage over the client for the collection of a fee. Skelton's testimony established that his license had been reinstated, pending final disposition of the disciplinary proceedings.[8] The hearing ended

---

[8] Skelton has since been permanently and finally disbarred by the Texas State Bar because of conduct giving rise to two different complaints against him, the oldest of which dates back to

40

with the arguments of counsel relating to the relative importance of Skelton's credibility.

This time there were no post-hearing briefs, and on June 18, 1998, the district court entered a final judgment vacating Perillo's conviction and her death sentence. The district court found:

> Skelton's credibility is questionable. During his testimony in this proceeding he admitted to and defended his practice of sometimes lying to his clients. One such episode, which he attempted to explain but did not defend, is the basis for current State Bar disciplinary proceedings against him, in which his disbarment has been sought.

The district court phrased its findings to express doubt about the veracity of Skelton's representations that he never spoke to his client Fletcher about the facts of her case at her trial, or when he negotiated immunity for her during Briddle's trial, or when she returned to testify against Briddle and stayed in his home, or at any other time prior to the evening before her testimony in Perillo's second trial. The district court further noted the substantial personal relationship between Skelton and Fletcher, "that had arisen out of Skelton's successful defense of Fletcher and his later participation as her surrogate father at her wedding." The district court agreed with our Court's prior statement that Skelton's close friendship with Fletcher, while not necessary to the decision, "confirms the reality of the conflict of interest position in which Skelton placed himself." *Perillo I*, 79

---

1992. In one of those matters, Skelton sought the payment of fees from an indigent defendant that he was court appointed to represent.

F.3d at 451 n.13.

With respect to the actual conflict issue, the district court held that Skelton owed Fletcher a continuing duty of loyalty based upon his former and concurrent representation of Fletcher. Had Skelton impeached Fletcher's testimony, she could have been prosecuted for perjury. By not impeaching Fletcher's testimony, Skelton made a choice not to pursue a plausible defensive strategy that could have had significant impact with respect to Perillo's punishment.

The district court persuasively contrasted Skelton's decision to secure independent counsel for Fletcher on the potential for conflicts with Skelton's failure to likewise protect or inform his other client, Perillo, about either the details of Skelton's former representation of Fletcher or the details of Skelton's ongoing relationship with Fletcher, let alone her rights in the event of a conflict of interest. The district court further found, as a matter of fact, (1) that Skelton guided Fletcher's cross-examination with leading questions throughout, (2) that Skelton elicited details concerning his former representation of Fletcher, (3) that Skelton elicited testimony that Fletcher had met with the victim's mother about possibly helping in the prosecution of Briddle, (4) that Skelton made a careful record of the fact that he had not discussed the facts of the case with Fletcher before the previous evening, and (5) that Skelton's cross-examination revealed a host of extraneous bad acts by Perillo and essentially repeated the most damaging portions of the state's direct. Despite

42

Perillo's persistent demands that Skelton cross-examine Fletcher regarding her more extensive involvement in the crime, which neither Skelton nor Pelton deny, Skelton did not attempt to discredit or minimize Fletcher's testimony in any way. The district court discounted Skelton's assertion that Fletcher wanted to help Perillo, citing Fletcher's testimony that she was "pleased" with the outcome of Perillo's trial.

With respect to adverse effect, the district court found that Skelton's conflict affected his performance as Perillo's counsel, both on the issue of guilt and on the issue of punishment. The district court identified at least three plausible alternative defensive strategies or tactics that could have been employed, but were not because of Skelton's conflict of interest. Those three were: (1) adducing evidence that Fletcher had blood on her jeans when arrested, indicating a more active role in the murders and thereby impeaching Fletcher's credibility; (2) pointing out to the jury that Perillo turned Fletcher and Briddle in to the police, giving Fletcher a motive for incriminating Perillo; and (3) impeaching Fletcher's testimony with her prior inconsistent statement to Denver Police that she last saw Banks when he let her off on the freeway, and that as far as she knew, Banks was alive and well. The district court also identified at least two points where Skelton's performance was impaired as a result of the conflict: (1) when Skelton permitted Fletcher to further incriminate Perillo by eliciting testimony from Fletcher regarding Perillo's alleged participation in a variety of extraneous

43

offenses; and (2) when Skelton protected Fletcher from a rigorous cross-examination by reviewing his cross-examination with Fletcher prior to her testimony.  The district court found that each of these examples of adverse effect was proven by a preponderance of the evidence.

The Director filed a motion for reconsideration which was denied.  The Director's timely notice of appeal followed.

## IV.

The parties' arguments on the issue of actual conflict depend in large part upon the distinction between concurrent and successive representation.  Several of our sister circuits have drawn such a distinction in Sixth Amendment conflict of interest cases, holding that an actual conflict may be more difficult to prove when it arises from the context of successive or serial representation rather than concurrent representation.  *See, e.g.*, *Freund v. Butterworth*, 165 F.3d 839, 859 (11th Cir.), *cert. denied*, 120 S. Ct. 57 (1999); *Maiden v. Bunnell*, 35 F.3d 477, 480 (9th Cir. 1994); *McConico v. Alabama*, 919 F.2d 1543, 1546 (11th Cir. 1990). *But see* *Church v. Sullivan*, 942 F.2d 1501, 1511 (10th Cir. 1991) (rejecting the view that successive representation cases are necessarily more difficult to prove).  The Director seeks to rely upon this distinction, by placing Perillo's claim squarely in the category of those cases involving exclusively successive, rather than concurrent, representation.  The problem is that, even if the Director were correct that this case involved purely successive representation, a premise with which we do not agree, Perillo would

44

still be entitled to relief.

The Director first argues that Perillo's claim is *Teague*-barred because *Cuyler* does not clearly apply to cases involving successive, as opposed to concurrent, representation. We disagree. *Cuyler* has never been limited to concurrent representation cases in this circuit. Indeed, our most recent en banc treatment of *Cuyler* expressly extends *Cuyler* to all cases of multiple representation, whether successive or concurrent. *See* *Beets v. Scott*, 65 F.3d 1258, 1265 (5th Cir. 1995) (en banc) ("*Strickland* offers a superior framework for addressing attorney conflicts outside the multiple or serial client context.") & *id*. at 1265 n.8 ("*Cuyler* has been routinely applied to cases in which an alleged attorney conflict resulted from serial representation of criminal defendants as well as simultaneous multiple representation. . . . For convenience, we denominate both of these situations as 'multiple representation.'"). Moreover, *Cuyler* itself can be viewed as a serial or successive representation case. In *Cuyler*, three defendants were represented by the same two lawyers at the three defendants' successive trials for the same offense. When the first defendant was tried, counsel rested after presentation of the state's case and without presenting a defense. *See* *Cuyler*, 100 S. Ct. at 1712. Although the two lawyers later disagreed as to why no defense was presented in the first trial, one of the lawyers testified that he did not want to present a defense in the first trial because it would prejudice the remaining two cases by exposing potential defense witnesses. *See* *id*. at 1713. The first

45

defendant filed suit arguing that his right to conflict-free counsel was impaired. The Third Circuit granted relief on the basis that the multiple representation involved a "possible" conflict of interest. The Supreme Court vacated, but remanded for reconsideration of whether the successive representation of the three defendants created an actual, as opposed to possible, conflict of interest. *See id*. at 1719. Given that *Cuyler* has routinely been applied to cases involving successive representation, the Director's position that Perillo's claim is either not governed by *Cuyler* or is *Teague*-barred because her claim is not clearly governed by *Cuyler* is without merit.

Several circuits have established a separate standard for successive, as opposed to concurrent, representation, holding that an actual conflict may not be shown absent proof (1) that counsel actually learned particular confidential information in the course of the prior representation, or (2) that there is a substantial relationship between the former and subsequent representations, or (3) that counsel otherwise divided his loyalties. *See, e.g.*, **Enoch v. Gramley**, 70 F.3d 1490, 1496 (7th Cir. 1995); **Maiden**, 35 F.3d at 480; *see also* **Freund**, 165 F.3d at 859 (applying a more narrow test requiring proof (1) that counsel learned confidential information during the course of the first representation, or (2) that there is a substantial relationship between the first and second representations). The distinction drawn in these cases between concurrent and successive representation is premised in part upon analogous ethical rules, which may be informative but are not

determinative with respect to whether there is an actual conflict for Sixth Amendment purposes. *See **Strickland***, 104 S. Ct. at 2065. The distinction is also premised upon generalizations about the factual context that tends to be associated with each type of claim. In a claim involving concurrent representation, there is an obvious temporal relationship and the substantive relationship between the two representations may also tend to be closer. *See, e.g., **United States v. Malpiedi***, 62 F.3d 465, 467-68 (2d Cir. 1995); ***Nealy v. Cabana***, 782 F.2d 1362, 1363-65 (5th Cir. 1986). Similarly, in a case of successive representation, both the temporal and substantive relationship between the two representations may be quite remote. *See, e.g.*, ***Enoch***, 70 F.3d at 1495-97. Those generalizations may not, however, hold universally true. *See **United States v. Winkle***, 722 F.2d 605, 609-12 (10th Cir. 1983); *see also **Church***, 942 F.2d at 1511 & n.8 (rejecting focus upon whether multiple representations were concurrent or successive in favor of a focus upon the relationship between the multiple representations).

Our Court has not definitively embraced the theory that there is any real and inviolate substantive difference between conflicts of interest arising in the context of successive, as opposed to concurrent, representations. Instead, we have in each case focused upon the "guiding principle in this important area of Sixth Amendment jurisprudence," which is whether counsel's allegiance to the accused was compromised by competing obligations owed to other clients. ***Alvarez***, 580 F.2d at 1255, 1258. That is not to say that

47

those factors employed in the threshold tests employed by our sister circuits are without import in our own precedent. A conflict of interest may exist by virtue of the fact that an attorney has confidential information that is helpful to one client but harmful to another. *See United States v. Placente*, 81 F.3d 555, 559 (5th Cir. 1996) (collecting cases). Likewise, we have relied upon the relationship between the subject matter of the multiple representations when determining whether counsel was burdened by an actual conflict. *See, e.g.*, *Russell v. Lynaugh*, 892 F.2d 1205, 1214 (5th Cir. 1989); *see also Alvarez*, 580 F.2d at 1259 (stating principle and collecting consistent cases). This Court has also relied upon the temporal relationship between the prior and subsequent representations. Where the prior representation has not unambiguously been terminated, or is followed closely by the subsequent representation, there is more likely to be a conflict arising from defense counsel's representation of the first client. *See, e.g.*, *Stephens v. United States*, 595 F.2d 1066 (1977). Where, on the other hand, defense counsel's prior representation unambiguously terminated before the second representation began, the possibility that defense counsel's continuing obligation to his former client will impede his representation of his current client is generally much lower. *See, e.g.*, *Vega v. Johnson*, 149 F.3d 354 (5th Cir. 1998), *cert. denied*, 119 S. Ct. 899 (1999). This Court has also relied upon the character and extent of the prior representation. Where the prior representation involved a formal and substantial attorney-client relationship, a finding of actual

conflict is more likely. *See, e.g.*, **Alvarez**, 580 F.2d 1251; **Castillo v. Estelle**, 504 F.2d 1243 (5th Cir. 1974). Where, however, defense counsel's involvement in the prior representation was either transient or insubstantial, we have been less inclined to find an actual conflict. *See **United States v. Olivares***, 786 F.2d 659, 663 (5th Cir. 1986). Thus, whether the facts of a particular case give rise to an actual conflict depends, not so much upon the label used to define the attorney's conflict, as upon these and any other factors that illuminate whether the character and extensiveness of the prior representation were such that counsel is prevented "by his interest in another's welfare from vigorously promoting the welfare of his [current] client." **Vega**, 149 F.3d at 360.

The Director argues that we should abandon this multi-factoral approach and adopt a more limited formulation restricting more than even our sister circuits when an actual conflict may exist in a case involving successive representation . The Director maintains that an attorney's loyalty to his current client can never be fettered by any inconsistent duty owed to a former client, absent proof that counsel obtained confidential information during the course of the first representation. Stated differently, the Director maintains that a lawyer can never owe any duty to a former client aside from the duty to preserve confidential information. The Director then relies upon evidence that Skelton never obtained any confidential information from Fletcher for the legal conclusion that Skelton could not have been burdened by an actual conflict.

We disagree with both the factual premise and the legal conclusion of the Director's argument. The rather remarkable proposition that Skeleton learned no confidential information during the course of his lengthy professional and personal relationship with Fletcher depends upon the testimony of Skelton himself. Skelton's testimony on this point is significantly undermined by Skelton's additional testimony and Gray's testimony that good criminal practice would have required that he discuss the facts of the case, at least to some extent, with Fletcher, and by certain then-applicable ethical rules that would have required Skelton to discern what Fletcher knew about the crimes. *See* ABA STANDARDS FOR CRIMINAL JUSTICE, Standard 4-3.2(a) (providing that the attorney for the accused should "seek to determine all relevant facts known to the accused" as soon as practicable). Whatever remaining weight that evidence could be given is completely destroyed by the ample evidence in this record that Skelton endorses the practice of lying in a professional context where the truth does not suit. The district court expressly found Skelton's testimony to be incredible. We agree, and therefore reject Skelton's incredible testimony that he never obtained any confidential information from Fletcher.

Moreover, even if Skelton's incredible testimony were credited as being truthful, that evidence establishes only that Skelton never obtained any confidential information directly from Fletcher herself. But an attorney's duty of confidentiality is broader than just client communications, and extends to all confidential

information, whether privileged or unprivileged, and whether learned directly from the client or from another source. *See Brennan's, Inc. v. Brennan's Restaurants, Inc.*, 590 F.2d 168, 171-72 (5th Cir. 1979) (discussing scope of duty of confidentiality under ABA standards); *see also Douglas v. DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 369-70 (5th Cir. 1998) (discussing scope of the duty of confidentiality under similar Louisiana ethical rules), *cert. denied*, 119 S. Ct. 798 (1999). To the extent that the relevant ethical standards are probative on the issue of actual conflict, we note that that was the scope of the duty of confidentiality when Perillo was tried,[9] and remains the scope of that duty today.[10] Thus, Skelton's testimony that he never learned any confidential information *directly from* Fletcher is simply not probative with respect to whether Skelton learned confidential information about Fletcher's case during the course of his lengthy professional relationship with Fletcher.

We likewise reject the Director's legal conclusion that an

---

[9] *See* ABA MODEL CODE OF PROFESSIONAL RESPONSIBILITY DR 4-101 (requiring an attorney to preserve privileged "confidence[s]," as well as unprivileged "secrets") & *id*. Canon 4, EC4-4 (providing that an attorney's duty of confidentiality "exists without regard to the nature or source of the information or the fact that others share the knowledge"). Texas adopted the ABA Model Code of Professional responsibility in 1969. *See* TEXAS CODE OF PROFESSIONAL RESPONSIBILITY DR4-101 & *id*. Canon 4, EC-4 (same).

[10] *See* ABA MODEL RULE OF PROFESSIONAL RESPONSIBILITY 1.6 & cmt. 5 ("The confidentiality rule applies not merely to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source."). Texas adopted the Model Rules in 1990. *See* TEXAS DISCIPLINARY RULE OF PROFESSIONAL CONDUCT 1.05(a) & cmt. 4 (extending Rule 1.05 to both privileged information furnished by the client and unprivileged information relating to the client).

51

attorney's possession of confidential information is the only factor of any importance when examining whether an attorney's successive representation of multiple defendants in the same criminal episode deprived the second client of his or her Sixth Amendment rights. The Director is essentially arguing that an attorney can take an adverse position undermining the attorney's prior work the moment (or as in this case, within a few hours after) concurrent representation ends, and without regard to whether there has been a waiver of the conflict on the record, so long as there is no confidential information to protect. Such an approach would be inconsistent with our own precedent, the applicable ethical rules, and every other circuit to have specifically addressed the issue. While we have not expressly adopted a rule providing that proof of a substantial and particular relationship between two successive representations may, together with additional evidence, support a finding of actual conflict, we have clearly and unambiguously relied upon the relationship between multiple representations when examining whether an attorney's dual relationship with two or more clients infringed upon a defendant's Sixth Amendment right to the effective assistance of conflict-free counsel. *See* **Russell**, 892 F.2d at 1214; **Olivares**, 786 F.2d at 663; **Martinez**, 630 F.2d at 362; *see also* **Alvarez**, 580 F.2d at 1254, 1257. We have also relied upon the "substantial relationship" test when reviewing a former client's motion to disqualify counsel from pursuing successive and potentially adverse representation of another client in civil cases. *See, e.g.*, **In re American Airlines**,

52

972 F.2d 605, 614-16 (5th Cir. 1992) ("This Circuit adopted the substantial relationship test before the promulgation of the Rules of Professional Conduct."). In that context, "[o]nce it is established that the prior matters are substantially related to the present case, the court will irrebuttably presume that relevant confidential information was disclosed during the former period of representation." *Id*. at 614.

The Director relies upon the irrebuttable presumption arising in the civil disqualification context to argue that the "substantial relationship" test is really nothing more than a rule of proof designed to avoid difficult evidentiary hurdles associated with proving that counsel obtained confidential information in the course of the first representation, which may be disclosed in the course of the second representation. We disagree. We have refused to "reduce the concerns underlying the substantial relationship test to a client's interest in preserving his confidential information." *Id*. at 616-18. To the contrary, the substantial relationship test is concerned with both "a lawyer's duty of confidentiality and his duty of loyalty" to a former client. *Id*. at 619.

The relevant ethical standards likewise distinguish between the attorney's duty not to reveal confidential information obtained in the course of a prior representation in the course of a second representation and an attorney's duty not to represent adverse interests in the same or a substantially related matter. For example, ABA Model Rule of Professional Conduct 1.9 contains a

blanket provision prohibiting an attorney from accepting subsequent employment adverse to the interests of a former client in the same or a substantially related matter. *See* ABA MODEL RULE OF PROFESSIONAL CONDUCT 1.9 & cmts. 1, 6, & 10 (distinguishing between the duty of confidentiality and the duty to refrain from undermining the work product produced for the former client or advocating for an interest that is materially adverse to the former client). Similarly, Texas Disciplinary Rule of Professional Conduct 1.09 prohibits subsequent employment in a matter adverse to the former client, not just when the subsequent representation will probably involve the disclosure of confidential information learned in the course of the former representation, but also when counsel's representation of the second client will call the validity of the lawyer's services or the work product produced for the former client into question, or when counsel will be representing adverse interests in the same or a substantially related matter. TEXAS DISCIPLINARY RULES OF PROFESSIONAL CONDUCT 1.09(a)(1-3). Similarly, although the former Model Code of Professional Responsibility did not expressly address an attorney's duty of loyalty to a former client, we have held that such a duty was implicit in certain provisions of the Code. *See* *id*. at 618 (addressing Canon 9 of the MODEL CODE OF PROFESSIONAL RESPONSIBILITY, Canon 9)*; see also* ABA MODEL RULE OF PROFESSIONAL CONDUCT DR 5-105 nn. 36-37 (extending to rule prohibiting representation of "differing interests" to the successive representation context). Thus, contrary to the Director's

54

argument, our Sixth Amendment precedent, our analogous disqualification precedent, and the relevant ethical standards all support the proposition that Skelton owed Fletcher, his former client, not just a duty to preserve any client confidences, but also a duty to avoid accepting employment that was adverse to her interests in the same or a substantially related matter. At the same time, Skelton owed Perillo, his client facing capital charges, a duty of loyalty, which encompassed a duty to avoid conflicts of interest by refusing subsequent employment advocating materially adverse interests, *see, e.g.*, **Strickland**, 104 S. Ct. at 2065; **Cuyler**, 100 S. Ct. at 1717, and a duty to zealously advocate on her behalf, unhampered by any competing commitments to other clients, *see, e.g.*, **Nealy**, 782 F.2d at 1365; **Alvarez**, 580 F.2d at 1254.

Having set forth those general principles, we proceed to an analysis of whether Skelton was burdened by an actual conflict between the interests of his two concurrent clients in this case.

**V.**

An actual conflict may exist and the Constitution is implicated when an attorney is placed or places himself or herself in a situation "inherently conducive to divided loyalties." **Castillo**, 504 F.2d at 1245; **Johnson v. Hopper**, 639 F.2d 236, 238 (5th Cir. 1981) (internal quotations omitted); **Zuck v. Alabama**, 588 F.2d 436, 439 (5th Cir. 1979) (internal quotations omitted); *see also* **Placente**, 81 F.3d at 558. "An attorney who cross-examines a former client inherently encounters divided loyalties." **United States v. Voigt**, 89 F.3d 1050, 1078 (3d Cir. 1996); **Lightbourne v.**

55

*Dugger*, 829 F.2d 1012, 1023 (11th Cir. 1987); *see also* **Stephens**, 595 F.2d at 1070; **Castillo**, 504 F.2d at 1245 (involving representation of government witness against second client). "In these circumstances, counsel is placed in the equivocal position of having to cross-examine his own client as an adverse witness. His zeal in defense of his client the accused is thus counterpoised against solicitude for his client the witness." **Castillo**, 504 F.2d at 1245. But, in keeping with the requirement for an actual, as opposed to a mere hypothetical or possible conflict, this Court has also held that something more must be shown to demonstrate that the inherent potential for conflict actually moved into the realm of an actual conflict. *See, e.g.*, **Olivares**, 786 F.2d at 663-64.

That "something more" is amply demonstrated in this case. Skelton represented Fletcher at her own aggravated robbery trial, a proceeding in which she originally faced the same charge for the same murders arising from the same facts as Perillo. Skelton's prior representation of Fletcher thus occurred in the same, or at the very least, in a very closely related criminal matter. From its inception, Skelton's prior representation of Fletcher featured the denigration of Perillo as a prominent factor. Indeed, Skelton's strategy at Fletcher's criminal trial was to develop the most egregious and inculpatory evidence of Perillo's own guilt, and by comparison, Fletcher's innocence.

After Fletcher's trial, Skelton became closely aligned with the victim's interests, strongly encouraging Fletcher's involvement with the victim's families' and their attempts to independently

56

investigate the crimes. When Briddle came to trial, Skelton strongly encouraged Fletcher to volunteer her testimony. Skelton successfully negotiated at least use, and probably full transactional, immunity in exchange for Fletcher's pre-trial statement and subsequent testimony in Briddle's trial. Thus, once again, Skelton's work product in the course of his prior representation of Fletcher led directly to the development and preservation of the most damaging evidence against Perillo, evidence that clearly led to Perillo's conviction and ensured the death penalty at Perillo's subsequent trial. Those circumstances, and particularly the fact that Fletcher's immunity agreement (Skelton's work product in the prior representation) depended upon the truthfulness of Fletcher's incriminating testimony against Perillo, should have made the potential for conflict obvious when Pelton approached Skelton about representing Perillo. Notwithstanding those circumstances, Skelton agreed to represent Perillo. Having done so, Skelton immediately called Fletcher to apprise her of the situation. Skelton did not, however, inform Perillo concerning the details of his past representation of Fletcher.

The inherent potential for conflict arising from Skelton's prior representation of Fletcher would never have come to fruition if Fletcher had not been subpoenaed to testify at Perillo's trial. But she was, and at Fletcher's request, Skelton left Perillo's trial and went to California to represent Fletcher's interests. Thus, Skelton agreed to represent the state's star witness *after*

57

Perillo's trial began, and this is not a case of purely serial representation.  *See* **Perillo I**, 79 F.3d at 449.[11]

As Fletcher's counsel at the California hearing, Skelton owed Fletcher the "unfettered duty of complete, legitimate support, not the task of undermining and tearing down" her credibility or his earlier work on her behalf.  **Stephens**, 595 F.2d at 1070; *see also* **United States v. Winkle**, 722 F.2d 605 (10th Cir. 1983) (vacating conviction and remanding for determination of whether potential conflict blossomed into actual conflict where defense counsel previously represented government witness in a related civil dispute); **Alvarez**, 580 F.2d at 1258 (recognizing the "conflict inherent in allowing defense counsel to simultaneously to advise a codefendant who has agreed to testify for the government."); **United States v. Mahar**, 550 F.2d 1005, 1008-09 (5th Cir. 1977) (same).  "A lawyer's role encompasses much more than simply advising a prospective witness to tell the truth; he must take additional steps to prepare him [or her] to testify."  **Alvarez**, 580 F.2d at 1258; *see also* **id**. ("It is during this preparatory stage that defense counsel is torn between serving the witness' best interests in fully cooperating with the government in supplying credible testimony and the accused's obvious desire to discredit the witness' testimony.  The Constitution does not countenance such

---

[11]In **Perillo I**, we characterized Skelton's representation of Fletcher in California and Perillo at trial as "concurrent," 79 F.3d at 448, and "simultaneous," **id.** at 449.  While not essential to our disposition, we reiterate here that we reaffirm, on the basis of the entire record as supplemented on remand, that this case involves both concurrent as well as successive representation by Skelton.

divided loyalties."). Although both of Skelton's clients wanted to avoid Fletcher's testimony, their reasons for doing so were very different. Once Fletcher was directed to return to Texas, that potential conflict between the two women's interests ripened into an actual conflict. From that moment on, Fletcher needed to testify, as she did at Briddle's trial, that she was not in the house when the murders occurred. Perillo needed to show that Fletcher was more actively involved in the offenses, to impeach Fletcher's credibility, to minimize the effect of her testimony, and to highlight the disparity in punishment for comparable conduct.

Skelton was laboring under an actual conflict because he had to choose between undermining the work product resulting from his prior representation of Fletcher by exposing her to perjury charges and vigorously pursuing the impeachment of Fletcher. Perillo has established that Skelton either knew or should have known prior to Fletcher's testimony that Perillo's version of the facts reflected a more active involvement by Fletcher. That information was helpful to Perillo, in that it would further Skelton's trial strategy by demonstrating that Briddle had even greater control over Fletcher and by highlighting the potential disparity between Fletcher' five year probated sentence and the potential death sentence in Perillo's case. That information was potentially devastating to Fletcher, in that proof that she was more actively involved than she had admitted at Briddle's trial would, at the very least, subject her to criminal perjury charges. *See* **Placente**,

59

81 F.3d at 558-59 (an actual conflict may exist when "counsel's introduction of probative evidence or plausible arguments that would significantly benefit one defendant would damage the defense of another defendant whom the same counsel is representing"); *Perillo I*, 79 F.3d at 447 (an actual conflict may exist "when one client would benefit by a person testifying and one client would be harmed by it."); *Nealy*, 782 F.2d at 1365 ("A defendant is entitled to an attorney who can make a decision to use or not to use testimony unfettered by the effect of that decision on his other client's case.") (internal alternations and quotations omitted). Further, Fletcher was testifying pursuant to a grant of immunity that was either negotiated by Skelton or obtained during the course of his representation of Fletcher. An actual conflict exists when "counsel, unknown to the accused and without his [or her] knowledgeable assent, is in a duplicitous position where his [or her] full talents as a vigorous advocate having the single aim of acquittal by all means fair and honorable are hobbled or fettered or restrained by commitments to others." *Alvarez*, 580 F.2d at 1254. Once Fletcher took the stand, Skelton was in no position to undermine the validity of Fletcher's immunity agreement, which was either negotiated by him or obtained during the course of his representation of Fletcher. *See Stephens*, 595 F.2d at 1070; *see also Winkle*, 722 F.2d 605.

Skelton's agreement to represent Fletcher after Perillo's trial began makes this case most closely analogous to those cases in which counsel is still actively representing the potentially

adverse interest close to or during trial.  In such cases, as in
this one, the actual conflict is most apparent when defense counsel
cross-examines the former client.  For example, in *Alvarez*, 580
F.2d 1251, defense counsel represented multiple clients in a drug
conspiracy case.  All of counsel's clients except one pleaded
guilty.  When the government identified two of defense counsel's
former clients as potential government witnesses in the remaining
defendant's trial, counsel represented those former clients in a
motion to resist testifying at the remaining defendant's trial.
*See id*. at 1254.  Counsel lost the battle when, as in Perillo's
case, the government agreed to grant the two testifying clients
immunity.  The Court held that, at this point, and even before the
trial started, there was an actual conflict arising out of
counsel's "irreconcilable task of at once bolstering [to protect
their rights under their plea agreement] and discrediting [to
protect the rights of the remaining defendant] the testimony" of
the two potential witnesses.  *Id*. at 1257.  We expressly held that
even the pre-trial conflict would be sufficient to support its
decision reversing the convictions.  *See id*.  Counsel then went on
to conduct a very limited cross-examination of his former clients.
*See id*. at 1258.

As in *Alvarez*, this case involves defense counsel's active
representation of a former client's interests while that client was
on the stand testifying against defense counsel's current client.
Skelton's own testimony, as well as the remaining record evidence,
demonstrates that Skelton thought he could avoid the obvious

61

conflict with a strategy intended to reconcile Fletcher's and Perillo's divergent interests. Thus, Skelton started with the premise that Fletcher's testimony was "set in stone," which simultaneously protected Fletcher's interests and limited the defensive theories available to Perillo. The blended result of Skelton's choice was an illogical and internally inconsistent trial strategy that eludes precise statement and, as developed *supra*, is simply not borne out in the record.

Finally, we note that an actual conflict may exist when an attorney represents two clients whose interests in the outcome of a matter are different. *See* **Perillo I**, 79 F.3d at 447. That Perillo and Fletcher had divergent interests with respect to the outcome of Perillo's trial is made painfully obvious by Fletcher's testimony that she was "pleased" with the outcome of Perillo's trial and that she does not care whether Perillo gets the death penalty. Likewise, Skelton's continuing relationship with Fletcher, even to the point of obstructing Perillo's access to Fletcher for purposes of this habeas proceeding, highlights the reality of his two client's divergent interests in the outcome of Perillo's trial.[12]

---

[12] We continue to believe that Skelton's personal relationship with Fletcher confirms the reality of Skelton's conflicted position. *See* **Perillo I**, 79 F.3d at 451 n.13. The Director argues that this Court's reliance upon Skelton's personal relationship with Fletcher as a basis for finding an actual conflict is precluded by this Court's en banc opinion in **Beets**. In **Beets**, this Court limited the application of **Cuyler** to the multiple representation context, holding that **Cuyler** does not apply when the alleged conflict is between counsel's personal interests and his professional duty to the accused. *See* **Beets**, 65 F.3d at 1271-73. Instead, **Cuyler** applies only when there is an actual conflict

The Director maintains that any actual conflict was completely dissipated by Will Gray's appearance on Fletcher's behalf at Perillo's trial. We disagree. The record establishes that Skelton continued to actively represent Fletcher's interests, even after Fletcher's afternoon meeting with Gray. Indeed, Skelton protected Fletcher from perjury charges and ensured that Fletcher's testimony would be consistent with her prior testimony by refreshing her recollection in a private consultation the night before her testimony. Skelton also ignored his duty to Perillo and protected Fletcher's interests by refusing Perillo's demands that he question Fletcher on inconsistencies and falsehoods in her testimony that Perillo has testified were intended to make Perillo look like the ringleader and to minimize Fletcher's own involvement. *See* **Winkle**, 722 F.2d at 609 (the inherent danger when counsel proposes to cross-examine a former client "is in what the advocate finds himself compelled to refrain from doing") (internal quotations omitted). Significantly, although Gray appeared briefly at Perillo's trial on Fletcher's behalf, both Skelton and Fletcher rejected Gray's only substantive advice by refusing to pursue a course that would permit Fletcher to invoke her attorney-client

_____

between the adverse interests of two or more clients. *Id*. We are not persuaded that **Beets** requires the conclusion that an attorney's personal relationship with a client is always immaterial when determining whether counsel labored under an actual conflict between the interests of the two clients. Nonetheless, we need not resolve the precise scope of **Beets** in this case because our decision that there was an actual conflict in this cases does not depend upon Skelton's personal relationship with Fletcher. There is ample evidence to establish that conflict without reliance upon the more subjective aspects of Skelton's relationship with Fletcher and her family.

privilege. Instead, Skelton coached Fletcher through an elaborated version of her prior testimony, once again elevating her interests over Perillo's by ensuring that Fletcher's prior testimony went unchallenged. While Skelton's continued advice to Fletcher the evening before the trial and coached cross-examination at trial technically occurred within that exceedingly narrow window of time, indeed a matter of hours, that Will Gray at least ostensibly replaced Skelton as Fletcher's lawyer, Skelton's relationship with Fletcher during that time was at least the type of functional equivalent of representation that may give rise to fiduciary duties. *See Beets*, 65 F.3d at 1267 (noting that *Wood v. Georgia*, 101 S. Ct. 1097 (1981) did not clearly state whether one of the competing obligations in that case arose from a formal attorney-client relationship, and stating that "the lawyer was at least in the functional equivalent of a joint representation"); *see also United States v. Malpiedi*, 62 F.3d at 467-69 (finding that counsel was burdened by an actual conflict arising from counsel's informal advice to a grand jury witness notwithstanding the attorney's opinion that there was no attorney-client relationship, that his communications with the witness was solely for the purposes of assisting his client, and that the witness was "fair-game" for cross-examination"); *Querner v. Rindfuss*, 966 S.W.2d 661, 667-68 (Tex. Ct. App.--San Antonio, writ denied) (recognizing that an attorney's advice may give rise to an informal fiduciary duty even when no formal attorney-client relationship is formed). That Skelton asked someone else to consult with Fletcher on a limited

64

issue and then rejected that lawyer's advice cannot, in this case, vitiate the obvious conflict arising from Skelton's prior, concurrent, and in fact continuing relationship with Fletcher.

The Director also argues that any duty owed to Fletcher was obviated by her consent to Skelton's dual representation, or by her waiver of the attorney-client privilege between she and Skelton. Contrary to that position, there is no evidence in this record that Fletcher made an informed decision to consent to Skelton's diligent representation of Perillo, even if that representation would serve to compromise her own interest. Likewise, there is no record evidence that Fletcher intentionally waived her attorney-client privilege. More importantly, the Director's arguments in this regard derail the relevant inquiry by focusing exclusively upon those ethical rules intended to protect the interests of a former client for the proposition that a subsequent client simply has no interests to protect. The point is not whether Skelton's obligation to Fletcher may, with the benefit of hindsight, be technically negated. Rather, the point is whether Skelton compromised his duty of loyalty and zealous advocacy to Perillo by choosing between or attempting to blend the divergent interests of his former and current client. *See Strickland*, 104 S. Ct. at 2064-67; *Cuyler*, 100 S. Ct. at 1718-19; *Alvarez*, 580 F.2d at 1255, 1258. The injury arising from such a compromise is not lessened by a showing that counsel did not simultaneously trample upon the rights of his or her former client. Indeed, the very essence of a conflict of interest is that it requires counsel to make a choice

65

between competing interests, and Perillo would not be able to show adverse effect if Skelton had not chosen Fletcher's interest over her own. Therefore, while we consider Skelton's continuing duties of confidentiality and loyalty to Fletcher to be strong and important evidence of Skelton's actual conflict in this case, we do not hold that a habeas petitioner can never prevail in a case involving successive representation absent proof that counsel owed some discrete and unavoidable legal duty to the former client. Our focus must remain at all times upon the adequacy of the complaining defendant's representation. *See Strickland*, 104 S. Ct. at 2064-67; *Cuyler*, 100 S. Ct. at 1718-19; *Alvarez*, 580 F.2d at 1255,

We emphasize that this is not a case where the defendant sat idly by without complaint as to the substance of the government witness' testimony, or where the defendant actually agreed with or relied upon the government witness' testimony. *See Alvarez*, 580 F.2d at 1259 (finding conflict where defendant vociferously objected to the substance of the first client's testimony and stating that there is no actual conflict where the defendant agrees with or concedes the substance of the first client's testimony). Perillo vigorously protested the accuracy of Fletcher's testimony as it was occurring and urged Skelton to cross-examine Fletcher on particular factual issues relating to Fletcher's own involvement. Likewise, this is not a case in which the defendant, fully informed of the relationship between her counsel and the state's witness, nonetheless insisted upon representation by a particular lawyer, only to turn around and claim on collateral

66

review that such representation was constitutionally deficient . *See, e.g.*, **United States v. Casiano**, 929 F.2d 1046 (5th Cir. 1991); **Olivares**, 786 F.2d 659. Perillo's objection to counsel regarding the substance of Fletcher's testimony and her lawyer's refusal to follow her instructions are amply supported in this record.

We affirm the district court's conclusion that Perillo has established by a preponderance of the evidence that Skelton was "torn in his loyalty and unable to make a decision purely in the interest of [Perillo] . . . to whom he owed undivided allegiance." **Nealy**, 782 F.2d at 1366. Having established that Skelton's representation of Perillo at trial was burdened by an actual conflict, we now examine whether that conflict adversely affected Skelton's representation of Perillo at trial.

## VI.

**Cuyler**'s adverse effect standard is set intentionally lower than **Strickland**'s actual prejudice standard. Under **Strickland**, a petitioner must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." **Strickland**, 104 S. Ct. at 2068. Under **Cuyler**, the focus is upon whether the actual conflict burdening counsel's performance had an actual and adverse effect on counsel's performance. Once it is established that there was an adverse effect on counsel's performance, prejudice, in terms of an effect on the outcome of the defendant's trial, is presumed. *See*

67

***Beets***, 65 F.3d at 1265.[13]

An adverse effect on counsel's performance may be shown with evidence that counsel's judgment was actually "fettered by concern" over the effect of certain trial decisions on other clients. ***Perillo I***, 79 F.3d at 448. As we held in ***Perillo I***, when a petitioner's claim is premised solely upon what a conflicted lawyer failed to do on his or her behalf, the petitioner must generally

---

[13] There are at least two rationales supporting the application of a lowered standard of prejudice in ***Cuyler*** cases, both of which are demonstrated in this record. First, a cold record may not reveal "the erosion of zeal that may ensue from divided loyalty." *See **United States v. Castillo***, 504 F.2d at 1245; *see also **Strickland***, 104 S. Ct. at 2067 ("[I]t is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests."); ***Johnson***, 639 F.2d at 239 (discussing the "nigh impossible task of making a meaningful qualitative analysis of trial counsel proficiency, in a case involving divided loyalties, from an examination of the transcript alone"). That premise holds particularly true when, as here, our task is to peruse the trial transcript "for subtle variations in demeanor and lack of vigor and depth" during cross-examination. *See **Johnson***, 639 F.2d at 239; ***see also Winkle***, 722 F.2d at 609. "Unlike competency of representation, where an attorney's conduct may fall anywhere along a continuum ranging from the incompetent to the superlative, conflict-laden representation is not susceptible of such fine gradations. Such representation is invidious, often escaping detection on review, and is tantamount to the denial of counsel itself." ***Alvarez***, 580 F.2d at 1256-57.

The Supreme Court has also recognized that there are institutional reasons supporting "a fairly rigid rule of presumed prejudice for conflicts of interest." *See **Strickland***, 104 S. Ct. at 2067. Defense counsel owes the client a duty of loyalty, which includes the "duty to avoid conflicts of interest." *See **id**. at 2064. In addition, trial courts can play an important role in situations inherently rife with conflict by ascertaining whether the defendant understands the consequences of the potential conflict and nonetheless wants to continue with the present lawyer. *See **Id**. at 2067. That rationale for ***Cuyler***'s lowered standard of prejudice is likewise at play in this record. At Perillo's trial, the trial court, the prosecutors, and Skelton himself showed every solicitude for Fletcher's knowledge and understanding of the implications of the actual conflict burdening Skelton's performance, without making any inquiry intended to protect Perillo's interests.

68

establish adverse effect  by demonstrating that there was some plausible alternative defense strategy that could have been pursued, but was not, because of the actual conflict. *See id*. at 449 (relying upon **Beets,** 65 F.3d at 1284 (King,J., dissenting), which in turn relied upon the Second Circuit's test for measuring adverse effect premised upon "what an attorney failed to do").[14] In this case, Perillo must show, not only that Skelton's performance was compromised, but that the compromises revealed in the record were generated by the actual conflict between Fletcher's and Perillo's interests.

The Director argues that there was no adverse effect on Skelton's performance in this case because Perillo has not demonstrated the required causal relationship between the actual conflict and any compromise in Skelton's advocacy on Perillo's behalf.  The Director first argues that there can be no finding of adverse effect because Skelton subjectively believed that Fletcher's and Perillo's interests were without significant conflict.  Thus, the Director maintains that, as a matter of subjective fact, Skelton did not deliberately elevate Fletcher's interests over Perillo's.  We disagree.  Skelton's testimony is incredible in light of abundant record evidence tending to establish that the actual conflict was painfully obvious to everyone concerned.  Moreover, "[a]fter the fact testimony by a

---

[14]While our analysis does not depend upon the distinction, we note that the record, including the record developed on remand after our prior disposition, establishes that more is involved in this case than mere omissions on Skelton's behalf.

lawyer who was precluded by a conflict of interest from pursuing a strategy or tactic is not helpful. Even the most candid persons may be able to convince themselves that they actually would not have used that strategy or tactic anyway, when the alternative is a concession of ineffective assistance resulting from ethical limitations." *Malpiedi*, 62 F.3d at 470. We have never premised the finding of an actual conflict or adverse effect upon evidence that the attorney intentionally compromised his professional loyalties; it is enough that there was an error in judgment that adversely affected Skelton's performance. *See* **Castillo**, 504 F.2d at 1245 ("We do not ascribe to Castillo's appointed attorney nor to the appointing judge improper motives, but they are chargeable with an error of judgment fatal to a fair trial.").

Similarly, the Director argues there can be no finding of adverse effect because Skelton subjectively believed that impeaching Fletcher would not have aided Perillo's defense. "But a showing of adverse effect does not require a but for inquiry." **Nealy**, 782 F.2d at 1365 (finding adverse effect where the record suggested that defense counsel decided against calling a particular witness because he feared the witness would harm the petitioner's case, rather than because he also represented the potential witness); *see also* **Malpiedi**, 62 F.3d at 469. To the contrary, the defendant need only establish that there was a plausible alternative defensive strategy that could have been pursued, but was not because of the actual conflict of interest.

We conclude that Perillo has proven that Skelton's performance

70

was adversely affected by the actual conflict of interest between Fletcher's and Perillo's interests. The record demonstrates that Skelton's representation of Perillo was fettered by competing concerns for Fletcher's welfare from the moment the state subpoenaed Fletcher to testify. That conflict was apparent in Skelton's pretrial advocacy, including his decision to protect Fletcher's interests by securing Gray's advice on how to handle Fletcher's testimony, by reviewing Fletcher's testimony to ensure that her Perillo testimony would be completely consistent with her Briddle testimony, and by his adoption of trial strategies that would bolster Fletcher's credibility, treat her as a friendly witness, and permit Fletcher's damaging Briddle testimony to remain "set in stone." The adverse effect on Skelton's performance is most dramatically illustrated by the content and structure of Skelton's cross-examination of Fletcher, together with his attendant refusal to follow Perillo's explicit instructions by vigorously cross-examining Fletcher and his refusal to allow Perillo to testify. That adverse effect is also illustrated by Skelton's desperate retreat to a completely illogical defensive position during the guilt phase, in which Skelton's only offering on Perillo's behalf was to have a police officer repeat the most damaging elements of the state's case against Perillo, as supplemented by the even more incriminating and inadmissible facts contained in Perillo's unsigned second statement. We have no trouble concluding, based upon the particular factual context of this case, that Skelton compromised his duty of loyalty to Perillo,

71

his capital client on trial, in order to accommodate his concurrent duty to avoid undermining his work product on Fletcher's behalf by exposing her to prosecution for perjury. Skelton may have convinced himself that the accommodation he crafted between the two women's interests would be good for both, but Perillo had the right to counsel unfettered by these competing concerns. *See, e.g.*, *Nealy*, 782 F.2d at 1365.

Perillo has also demonstrated that there were plausible alternative defense strategies that could have been pursued, but were not, because of the actual conflict between Fletcher's and Perillo's interests. Those plausible alternatives are detailed in our prior opinion, as well as in the district court's order. *See*, *e.g.*, *Perillo I*, 79 F.3d at 450-51 & n.12. Having reviewed the entire record, including the record on remand, we are persuaded that Skelton's failure to pursue these plausible alternatives, which could only have strengthened Perillo's defense under Skelton's chosen trial strategy, was in fact caused by the actual conflict between his obligations to Fletcher and Perillo. We therefore hold that Skelton's representation of Perillo was burdened by an actual conflict which adversely affected Skelton's performance throughout Perillo's trial.

## CONCLUSION

The district court's judgment granting Perillo's 28 U.S.C. § 2254 petition for relief from her capital conviction and sentence is AFFIRMED and the cause is REMANDED for further proceedings consistent with this opinion.

72