# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 27, 2013

No. 11-30171

Lyle W. Cayce
Clerk

DANNY RAY LEE

Petitioner–Appellant

v.

BURL CAIN, Warden, Louisiana State Penitentiary

Respondent–Appellee

Appeal from the United States District Court for the
Western District of Louisiana
No. 607:CV-339

Before JONES, GARZA, and PRADO, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:[*]

Petitioner–Appellant Danny Lee was found guilty of the 1994 murder of Sheila Tibblas. Lee appealed his conviction, claiming his trial attorney had labored under a conflict of interest because he had represented a key witness against Lee during a preliminary hearing in the same case. On remand, the state trial court granted Lee a new trial, but was reversed in a short opinion by the state appellate court. After exhausting his post-conviction remedies in state court, Lee brought this habeas action claiming a violation of his Sixth

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-30171

Amendment right to conflict-free counsel.  The federal district court, adopting the recommendation of the magistrate judge assigned to the petition, found that the state appellate court did not unreasonably apply the governing law and therefore denied habeas relief.  Lee then appealed to this court.  We find that the state appellate court did not come to unreasonable conclusions when it determined that (1) this case is governed by *Cuyler v. Sullivan*, and that (2) trial counsel's conflict of interest did not adversely affect Lee's trial. Lee has therefore failed to meet his burden under 28 U.S.C. § 2254(d)(1), and we AFFIRM the district court's denial of habeas relief.

## I.  FACTUAL BACKGROUND

### A.    The Events Preceding Trial

On April 5, 1995, Petitioner Danny Ray Lee was found guilty of second degree murder in the death of Sheila Tibblas.  *See State v. Lee*, 788 So. 2d 452, 453–54 (La. Ct. App. 2001).  According to testimony at Lee's trial, in August 1994, Lee and Tibblas set out on a road trip from Oklahoma with a married couple, Davey and Sherry Coslow ("Coslow" and "Sherry," respectively), intending to visit every state in the country.  At a stop in a sugarcane field in St. Mary Parish, Louisiana, Tibblas was murdered, allegedly because she was thought to have given information about Lee's involvement in drug dealing to police in Oklahoma.  According to  Coslow's  testimony, Lee told Coslow when they were in the field that he was planning to kill Tibblas.  Coslow testified that Lee brought Tibblas from the car into the middle of the field and began choking her.  Lee then asked Coslow for his knife and told Coslow to cut Tibblas's throat.  When Coslow could not bring himself to do so, Lee took the knife from Coslow and stabbed her in the throat himself.  Tibblas's body was then covered with a piece of tin and left in the field.

The three remaining members of the party continued on their trip, financing their travels with forged checks belonging to Tibblas.  They eventually

2

returned to Oklahoma.  After their return, and still using Tibblas's car, the group was pulled over for a traffic violation.  Lee was arrested for driving without a license, and Coslow was arrested for marijuana possession.  According to later testimony, Coslow told the police that marijuana found in the car belonged to him, even though it belonged to his wife.  Sherry Coslow and another woman in the car at the time of the traffic stop were released.

Shortly afterward, Sherry contacted police about Tibblas's murder. At her suggestion, police spoke with Coslow, who told the police Lee had murdered Tibblas, and directed them to Tibblas's body.  Sherry, Lee, and Coslow were all arrested for the murder.

## B.     The Preliminary Hearing

On November 9, 1994, Judge Thomas Bienvenu oversaw a preliminary hearing to perpetuate the testimony of Sherry Coslow in Louisiana district court. At the hearing, Davey Coslow was represented by a public defender, Craig Colwart.  A public defender from the same public defender's office, Gary LeGros, represented Lee.

In later testimony, Colwart claimed that as part of preparation for the hearing, he asked Coslow about whether anyone in the group had used drugs at any point during the trip, to which Coslow responded that they had.  According to Coslow, Colwart suggested that if asked about his drug use in court, Coslow should "downplay" it, though Colwart later disputed this account.  They also discussed possible sentences in the event Coslow pleaded guilty to accessory after the fact.  It appears Colwart talked to Coslow for no longer than an hour before the preliminary hearing.

At the hearing, Sherry Coslow testified that she saw Lee strangle Tibblas and heard him ask Davey Coslow for his knife.  She also admitted, though, that she turned away as the murder occurred.  A detective testified that she had told

3

him earlier that she saw her husband with the knife, but did not see who stabbed Tibblas.

Judge Bienvenu determined that although the evidence was stronger against Lee, there was probable cause enough to indict both Lee and Davey Coslow on murder charges. At that point, LeGros moved to sever the two cases, on the theory that "[his] client [Lee] and Mr. Coslow ha[d] somewhat antagonistic defenses." Colwart agreed, "on the basis of statements made by [my] client [Coslow]." Judge Bienvenu immediately granted the severance motion.

On November 28, 1994, a grand jury indicted Lee on a charge of second degree murder; Lee was arraigned and pleaded not guilty. Meanwhile, Coslow agreed to testify against Lee at Lee's trial in return for a reduced charge of manslaughter.

## C.    Lee's Trial

Lee's trial began on April 3, 1995, with Judge Paul deMahy presiding. Sometime after the preliminary hearing, but before trial, Coslow and Lee switched lawyers, so that Colwart now represented Lee and LeGros represented Coslow in his ongoing plea bargaining.[1] At trial, Coslow testified that Lee had choked, stabbed, and ultimately killed Tibblas. His testimony was corroborated by Sherry Coslow and other physical evidence. Lee did not testify at trial.

On cross-examination, Colwart asked Coslow, his former client, a number of questions that appear to have been aimed at undermining Coslow's credibility. Colwart asked whether Coslow had agreed to testify in return for more lenient

---

[1] According to Colwart's later testimony, it was always the intention of the Sixteenth District Indigent Defender Board, where both Colwart and LeGros were attorneys, that Colwart would represent whomever the District Attorney sought to prosecute for the murder, and LeGros would represent the other defendant in negotiating a deal with the district attorney for his testimony. Before the preliminary hearing, it seemed more likely Coslow was responsible for the murder, but after the hearing, suspicion shifted to Lee. Colwart therefore took over Lee's representation at trial.

No. 11-30171

treatment from the state. Coslow denied that he had (and indeed at the time of Lee's trial, Coslow did not yet have a plea bargain in writing). Colwart elicited an admission that Coslow had lied about the marijuana found in the car in order to protect his wife. At one point, Colwart asked Coslow if it was he who had in fact killed Tibblas, to which Coslow answered, "No, sir."

Colwart also cross-examined Coslow about drug use during the trip:

COLWART:    How many of you four were doing drugs on this trip?

COSLOW:    Me and my wife wasn't, sir.

COLWART:    You weren't smoking marijuana?

COSLOW:    On the trip?

COLWART:    Yes.

COSLOW:    No, sir.

A short time later, Coslow admitted, "We smoked some weed, some marijuana" in Oklahoma.[2] He testified that he never saw Lee or Tibblas with crystal meth. Colwart did not ask specifically about whether or not there had been drug use at the time of the murder.

Over the course of the trial, Coslow made statements that clearly indicated he had previously been represented by Colwart:

COLWART:    So, you did have a discussion, a discussion about being charged with and being prosecuted for accessory after the fact [that] was detailed enough that you would, you know you were informed of, that the potential sentence for accessory after the fact is five years, correct?

COSLOW:    Yes, you told me that *when you were my attorney*. (emphasis added).

---

[2] It is unclear from the trial transcript whether Coslow meant they smoked marijuana before or after they began the road trip.

Shortly afterward, he repeated, "[T]he only thing that I was informed about accessory after the fact charge was when you was my attorney and you told me the most it carried was five and then I asked my new attorney how much time did it carry and he said five . . . ."

On April 5, 1995, Lee was convicted of second degree murder by a unanimous jury. He was later given the mandatory sentence of life at hard labor without parole. Approximately three months after Lee's trial, Coslow pleaded guilty to manslaughter and received a sentence of six years at hard labor.

## D. Post-Conviction Events and Procedural Background

### 1. Lee's Early Appeals

On December 8, 1995, with Colwart still acting as his lawyer, Lee filed a Motion for Extension of Time to File Appellant's Brief. The extension was granted, but Lee's counsel nonetheless neglected to file a brief with the Louisiana First Circuit Court of Appeals, and the appeal was deemed abandoned. Between 1996 and 1999, Lee filed multiple pro se applications for post-conviction relief in the Sixteenth Judicial District Court, the First Circuit Court of Appeals, and the Louisiana Supreme Court, each of which was denied.

In 1999, through new counsel James E. Boren, Lee filed applications for post-conviction relief seeking out-of-time appeals in the Sixteenth Judicial District Court and the Louisiana Supreme Court. Lee's application in the Louisiana Supreme Court was denied, but the application in the District Court was granted, and he was thus able to file an out-of-time appeal in the First Circuit.

Lee's appeal in the First Circuit alleged two Assignments of Error: first, erroneous jury instruction and ineffective assistance of counsel based on failure to object to the jury instructions, and second, ineffective assistance of counsel

No. 11-30171

based on alleged conflict of interest.[3] The First Circuit "conditionally affirmed" Lee's conviction, but remanded to the District Court for an evidentiary hearing on the issue of trial counsel's conflict of interest, stating that if the District Court found merit to those claims, it should grant Lee a new trial.[4]

### 2. The Evidentiary Hearings and the New Trial Order

Two evidentiary hearings were held in the Sixteenth Judicial District Court, both presided over by Judge deMahy. The first, held on January 16, 2002, was convened to determine if Lee had waived his right to conflict-free counsel before his trial. After hearing testimony from Colwart, LeGros, and Lee, Judge deMahy determined that there had been no waiver, and a second hearing on the issue of whether Colwart had labored under an actual conflict of interest was scheduled.

This second evidentiary hearing was held on June 24, 2003. At this hearing, Boren, Lee's new counsel, introduced into evidence a letter that Davey Coslow had written while serving his sentence. The letter stated that Coslow, not Lee, had stabbed Tibblas, and that Coslow had lied in his testimony at Lee's trial. Coslow testified that he had shown the letter to a private investigator, and that he had told the investigator that he "believed some of [his letter] was true."[5] He also testified that he wrote the letter "to try to help [his] brother out,"[6] and that he did not believe writing it would create any adverse legal consequences for himself because of the plea deal he had made.

---

[3] Lee claims he was unaware of his right to conflict-free counsel and the possibility that Colwart labored under a conflict of interest until Boren became involved in his case.

[4] At an unspecified date around this time, Lee filed yet another appeal for writs to the Louisiana Supreme Court, which was denied.

[5] The investigator, Gordon Bulla, was hired by Boren to ask Coslow about the letter.

[6] Coslow and Lee share the same father. Lee and Sherry Coslow share the same mother.

No. 11-30171

Evidence was also presented on the issue of the group's drug use during the trip and what information Colwart received as part of his representation of Coslow. Coslow testified that he told Colwart "[they] were doing drugs . . . [but] didn't specify on which ones," and that Colwart told him to answer "no or just ignore the question" if asked about drug use on the stand. At one point, Coslow clarified that he was not "for sure" whether it was Colwart or LeGros he spoke to about drug use. It is unclear what Colwart remembers about what Coslow said to him about drug use. At one point, Colwart could not recall what specifically Coslow said about drug use at the time of the offense, but later in the hearing he testified that he was "sure" that Coslow told him "he was doing drugs during the trip." Colwart additionally testified that his general sense from all that was said before and during trial was that the group had run out of drugs and money by the time they reached the sugarcane field. Colwart denied ever telling Coslow to "downplay or minimize the amount of drugs that he had consumed prior to the killing of Sheila Tiblis [sic]."

Judge deMahy denied Lee's motion for a new trial on the basis of newly discovered evidence (Coslow's letter). However, with respect to the question of whether Colwart's conflict of interest adversely affected Lee's trial, Judge deMahy found that a new trial was warranted:

> I have reviewed the transcript of the trial . . . some of which deals with the cross examination of Davy [sic] Coslow regarding the use of drugs. Initially, he denies using any drugs, then he admits they smoked Marijuana. He denies even knowing that there was any Crank or Crystal Meth, which is the two names for the same drug, were present at any time during the trip. The testimony today by Mr. Coslow is that he told Mr. Colwart about them using Marijuana and Crystal Meth. And Mr. Colwart, although his memory was somewhat sketchy, seemed to recall that he received that information from Mr. Coslow regarding the use of Marijuana and Crystal Meth. *And, since he received*

8

No. 11-30171

> *that information as Mr. Coslow's attorney, he could not*
> *confront Mr. Coslow with a prior inconsistent statement*
> *regarding the use of Crystal Meth or Crank during the*
> *trip, or at the time of the murder.* This would, of course,
> challenge the credibility of Mr. Coslow at trial. And the
> two witnesses, eyewitnesses, more or less, against Mr.
> Lee were Mr. Coslow and Mrs. Coslow, and the primary
> witness being Mr. Coslow who testified that he saw the
> entire incident. A successful attack on the credibility of
> Mr. Coslow could affect the outcome of the case. So, I'm
> going to find that Mr. Colwart's conflict had an adverse
> impact on the representation of Danny Lee and will
> grant his motion for a new trial. (emphasis added).

The State applied for a writ of certiorari in the First Circuit, asking the court to reverse, *inter alia*, the grant of a new trial. The First Circuit granted the writ in an opinion that, in its entirety, read:

> WRIT GRANTED. The trial court erred in granting
> Lee's motion for a new trial. Considering the evidence
> produced at the evidentiary hearings and the cross-
> examination of Davey Coslow at Danny Lee's trial, it
> does not appear that Craig Colwart's representation of
> Lee and his previous representation of Coslow adversely
> affected his performance at Lee's trial. See **Cuyler v.**
> **Sullivan**, 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64
> L.Ed.2d 333 (1980) (typeface in original).

Lee appealed to the Louisiana Supreme Court, which denied his appeal without opinion. Lee again filed a number of motions asking for state post-conviction relief, all of which were denied.

On February 23, 2007, Lee filed a petition in federal district court seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254, claiming actual innocence, as well as a violation of his Sixth Amendment right to effective assistance of counsel because of counsel's conflict of interest. The court, adopting the report and recommendation of the magistrate judge, initially declared his application time-barred, but the Fifth Circuit vacated that decision and remanded to the

No. 11-30171

district court in light of the Supreme Court's opinion in *Jiminez v. Quarterman*, 129 S. Ct. 681 (2009), which overruled the case law barring Lee's application.

### 3.    The Federal District Court's Decision

Magistrate Judge Patrick Hanna reviewed Lee's habeas application on remand. In his petition, Lee argued that he was denied effective assistance of counsel for three principal reasons: (1) his trial counsel failed to adequately prepare for trial, (2) his trial counsel failed to discover exculpatory evidence before trial, and (3) a conflict of interest existed when his trial counsel previously represented a key witness in the same matter. The magistrate judge found the first two of these claims procedurally defaulted for not having been raised during state proceedings, but considered the merits of the third. He concluded that the First Circuit had properly disposed of Lee's claims: it was correct in its determination that *Sullivan*, not *Holloway*, provides the governing rule for Lee's case, and it was justified in finding that "any conflict of interest that might have existed did not adversely affect Lee's counsel's performance at trial." The recommendation noted that "[a]lthough Colwart did not directly confront Coslow with any prior inconsistent statement concerning drug use during the trip, Colwart did address drug use in his cross-examination, and he brought to light other evidence undermining both Davey Coslow's and Sherry Coslow's credibility." Magistrate Judge Hanna therefore recommended that Lee's petition be denied and dismissed his claims with prejudice.

On February 8, 2011, the federal district court for the Western District of Louisiana adopted Magistrate Judge Hanna's report and recommendation, and denied Lee's subsequent application for a certificate of appealability (COA). Lee filed an application for a COA in the Fifth Circuit on April 26, 2011. The Fifth Circuit granted the COA with respect to two issues: (1) whether the district court misapplied § 2254(e)(1) in its consideration of the fact findings of the state courts; and (2) whether *Holloway v. Arkansas*, 435 U.S. 475, 490 (1978), or

No. 11-30171

*Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980), governs Lee's case, and if the district court correctly applied *Sullivan*, whether Lee demonstrated that an actual conflict of interest adversely affected his lawyer's performance.

## II. DISCUSSION

### A.   Standard of Review and AEDPA Deference

In reviewing grants or denials of the writ of habeas corpus, this court reviews de novo the district court's disposition of pure issues of law and mixed issues of law and fact. *See Guy v. Cockrell*, 343 F.3d 348, 351 (5th Cir. 2003) *Valdez v. Cockrell*, 274 F.3d 941, 946 (5th Cir. 2001). We review its factual determinations for clear error. *Valdez*, 274 F.3d at 941.

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA") governs a federal habeas court's review of a state court's adjudication of the merits of a state prisoner's claims. 28 U.S.C. § 2254(d). When faced with a silent or ambiguous state habeas decision, such as the Louisiana Supreme Court's decision in this case, the federal habeas court must "look through" to the last clear state decision on the matter to determine which state court decision to review. *Jackson v. Johnson*, 194 F.3d 641, 651 (5th Cir. 1999). In this case, the last reasoned opinion was the First Circuit's, and so it is that opinion to which this Court applies AEDPA's standards.

Congress enacted AEDPA in order to address perceived abuses in the then-existing habeas system, limit the ability of prisoners to delay justice by filing frivolous claims, and respect the outcomes of state fact finding and law application. *See Michael Williams v. Taylor*, 529 U.S. 420, 436 (2000) (stating that AEDPA's purpose was to "further comity, finality, and federalism," and highlighting the importance of "limit[ing] the scope of federal intrusion into state criminal adjudications and . . . safeguard[ing] the States' interest in the integrity of their criminal and collateral proceedings"); *Day v. McDonough*, 547 U.S. 198, 205–06 (2006) (AEDPA was passed to "promote[] judicial efficiency and

11

conservation of judicial resources . . . and lend[] finality to state court judgments within a reasonable time"). In furtherance of these policies, "AEDPA . . . imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) (citations and internal quotation marks omitted).

### 1.    Deference to state conclusions of law

AEDPA provides separate standards of review for a state court's adjudications of pure issues of law or mixed issues of law and fact, on the one hand, and its adjudications of issues of fact, on the other. With respect to issues of law and mixed issues of law and fact, the relevant provision is § 2254(d)(1), which prohibits a federal court from granting habeas relief unless the state court's denial "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Valdez*, 274 F.3d at 946 ("We review questions of law and mixed questions of law and fact under the 'contrary to' and 'unreasonable application' prong of 28 U.S.C. § 2254(d)."). Questions about the effectiveness of counsel, including those that involve conflict-of-interest claims, are mixed questions of law and fact. *See Strickland v. Washington*, 466 U.S. 668, 698 (1984); *United States v. Infante*, 404 F.3d 376 (5th Cir. 2005) ("The determinations whether a conflict existed and whether the conflict had an adverse effect are mixed questions of law and fact."). Therefore, § 2254(d)(1) applies to the state appellate court's decision to follow *Sullivan* rather than *Holloway* in Lee's case, as well as its determination that Lee has not shown adverse effect, as *Sullivan* requires.

### 2.    Deference to state fact findings

AEDPA contains two separate provisions that govern a federal habeas court's review of state-court findings of fact. Section 2254(d)(2) provides that a prisoner is entitled to relief if the state adjudication of the claim "resulted in a

decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The other provision, § 2254(e)(1), reads: "[A] determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). Courts have long struggled with how to reconcile and read together the two provisions governing federal review of state court fact findings. *See* Justin F. Marceau, *Deference and Doubt: The Interaction of AEDPA §2254(d)(2) and (e)(1)*, 82 Tul. L. Rev. 385, 387–88 (2007). However, for the reasons below, this Court declines to use this case to resolve the debate.

The parties contend that we must resolve the issue of whether there are any state-court fact findings left to review when, as here, a state trial court is reversed by a state appeals court in an opinion accompanied by little reasoning. Lee argues that the facts as found by the state trial court, specifically the determination that Colwart failed to confront Coslow about a prior inconsistent statement about drug use during cross-examination, remain intact on federal habeas review. The State urges us to instead hold that the First Circuit's reversal of the district court's grant of a new trial means that the district court's fact findings were vitiated, and the federal district court should therefore have engaged in its own fact finding exercise. However, because we find that the First Circuit did not unreasonably apply the relevant legal standard even if the facts are construed in the light most favorable to Lee, we decline to reach the issue of what facts are or are not operative on appeal in this case.

**B.    Whether *Sullivan* or *Holloway* Applies**

A federal habeas court may reject a state court's determination of law if (1) the determination was "contrary to" federal law as established through Supreme Court precedent, or (2) it "involved an unreasonable application" of that law. 28 U.S.C. § 2254(d)(1). A state court's decision is "contrary to" clearly established federal law if it "applies a rule that contradicts the governing law set forth in [the

No. 11-30171

Supreme Court's] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Court's] precedent." *Terry Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). The "unreasonable application" clause, on the other hand, "requires the state court decision to be more than incorrect or erroneous.   [It] must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (citation omitted).

There are two determinations of law at issue in this case, and the First Circuit reached a reasonable conclusion with respect to each of them.  The first issue is what standard to apply in assessing whether Lee should be granted a new trial on the grounds that his counsel was conflicted, a question the parties have disputed since the conflict of interest was recognized.  Lee argues that the court should have applied the standard developed in *Holloway v. Arkansas,* 435 U.S. 475 (1978), which requires automatic reversal where counsel is forced to represent codefendants over his timely objection to the joint representation.  435 U.S. at 485–88; *see also Mickens v. Taylor*, 535 U.S. 162, 168 (2002). The State argues that *Cuyler v. Sullivan*, 446 U.S. 335 (1980), instead provides the relevant standard.  446 U.S. at 348–49.  *Sullivan* requires that the petitioner show not only that counsel was conflicted, but that the conflict adversely affected the adequacy of his representation.  *Id.*; *see also United States v. Infante*, 404 F.3d 376, 390–92 (5th Cir. 2005).  Every court that has reviewed Lee's claims, including the state appellate court, whose decision we review, has determined that *Sullivan*, and not *Holloway*, provides the operative standard.  We agree.

*Holloway* applies only if an attorney has been made to provide conflicted counsel over his own objection.  *See Mickens*, 535 U.S. at 168 ("*Holloway* . . . creates an automatic reversal rule *only* where defense counsel is forced to represent codefendants over his timely objection, unless the trial court has determined that there is no conflict.") (emphasis added); *cf. Holloway*, 435 U.S.

14

at 488 ("[W]henever a trial court improperly requires joint representation over timely objection reversal is automatic."); *Salts v. Epps*, 676 F.3d 468 (5th Cir. 2012) ("*Holloway*'s rule—not [*Sullivan*'s] actual-conflict standard—controls the [petitioners'] joint-representation claim in this case because the [petitioners, through their lawyers,] timely objected to their joint representation.").

Lee argues that because Coslow mentioned Colwart's previously having been his lawyer, the trial judge was on notice of a possible conflict of interest, and this qualifies his case for treatment under *Holloway*, as opposed to *Sullivan*. Lee's argument is without merit. The Supreme Court has made clear that trial counsel must *actively object* to a conflict of interest in order for *Holloway*'s automatic reversal rule to apply. *See Mickens*, 535 U.S. at 172. Because Colwart did not object to his own representation of Lee, *Holloway* does not apply. Even if we were to accept (and we do not) Lee's implied argument that Coslow's reference during cross-examination to Colwart's previous representation constitutes "timely objection," the state court's failure to so conclude was certainly not contrary to any existing Supreme Court precedent or otherwise "objectively unreasonable." *Cf. Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."). Therefore, Lee is not entitled to relief with respect to this aspect of his petition.

## C.    The First Circuit's application of *Sullivan*

The second legal determination Lee challenges in his petition is the First Circuit's conclusion that Colwart's conflict of interest did not adversely affect his performance at Lee's trial. Under *Sullivan*, a petitioner must show both that there was an "actual conflict of interest," and that the conflict "adversely affected" the adequacy of trial counsel's representation. *Sullivan*, 446 U.S. at 348. The

State does not argue that Colwart's conflict was not an "actual conflict," leaving only the issue of adverse effect in dispute.

The focus of the adverse effect standard "is upon whether the actual conflict burdening counsel's performance had an actual and adverse effect on counsel's performance." *Perillo v. Johnson*, 205 F.3d 775, 806 (5th Cir. 2000). More specifically, "[a]n adverse effect on counsel's performance may be shown with evidence that counsel's judgment was actually fettered by concern over the effect of certain trial decisions on other clients." *Id.* at 807 (internal quotation marks omitted). Adverse effect can be shown with evidence that some plausible defense strategy or tactic could have been used, but was not, because of the attorney's actual conflict of interest. *Id.* at 781. Factors the court may consider include: "(1) whether the attorney has confidential information that is helpful to one client but harmful to the other client; (2) whether and how closely related is the subject matter of the multiple representations; (3) how close in time the multiple representations are; and (4) whether the prior representation has been unambiguously terminated." *United States v. Burns*, 526 F.3d 852, 856 (5th Cir. 2008).

Lee's basic contention is that Colwart failed during cross-examination to confront Coslow with statements he had made to Colwart before the preliminary hearing about the group's drug use at the time of the murder, and that this failure was necessitated by Colwart's duty to keep conversations with his former client confidential. Had Colwart confronted Coslow with evidence of those statements at trial, Lee argues, Coslow's credibility would have been irreparably undermined, and his testimony about Lee's role in the murder called into serious question.

This theory, in essence, was also the basis for the state trial court's new trial order. It is unclear whether the First Circuit reversed that new trial order because it disagreed with the state trial court's "finding" that a prior inconsistent statement even existed, or instead because it disagreed with the conclusion that

failure to confront Coslow with the prior inconsistent statement amounted to adverse effect. The federal district court adopted the magistrate judge's finding that Colwart believed "from his discussions with Coslow during his brief representation of Coslow, that Coslow and the others had used drugs on the trip but had run out drugs by the time they got to Louisiana." In other words, according to the federal district court, Colwart did not believe there was a prior inconsistent statement he could have asked about even if he had been inclined to do so. The various courts' conflicting conclusions about the events leading up to the murder and the content of Coslow's private conversations with Colwart are the basis for the parties' dispute about the level of deference to accord the state trial court's fact findings. However, we find that even if the facts are viewed in the light most favorable to Lee, i.e., we accept that Colwart knew there existed a prior inconsistent statement with which he could have confronted Coslow, the First Circuit's legal determination that Lee did not show adverse effect is not unreasonable. Because the First Circuit was not unreasonable in its application of the prevailing law no matter which facts are adopted, we decline to resolve the issue of which fact findings remained in effect during Lee's federal habeas proceedings and how much deference AEDPA requires they be given.

In reviewing a state court's decision on the merits, "a habeas court must determine what arguments or theories could have supported the state court's decision; and then it must ask whether fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this court." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1402 (2011) (alterations and internal quotation marks omitted); *see also Harrington v. Richter*, 131 S. Ct. 770, 784 (2011) (noting that to satisfy the "unreasonable application" prong of § 2254(d)(1), a petitioner must show that "there was no reasonable basis" for the state court's decision); Matthew Seligman, Harrington*'s Wake: Unanswered Questions on AEDPA's Application to Summary Dispositions*, 64 Stan. L. Rev. 469,

497 (2012) ("Under the *Harrington* Court's methodology, federal habeas courts confronted with [an unreasoned state-court decision on the merits] must survey all the possible justifications for the decision, and attribute to the state court the most defensible."). Therefore, if there is any credible basis for the First Circuit's legal determination that Colwart's conflict of interest did not adversely affect his representation, Lee's claim fails.

Even if this Court assumes the Louisiana trial court was correct in its factual determination that Colwart knew of a prior inconsistent statement Coslow had made, the First Circuit was not unreasonable in its disposition of the adverse effect issue, a mixed question of law and fact that we review under § 2254(d)(1). While it is true that Lee need not show prejudice "in the sense that the outcome of the proceeding would have been different if it were not for [the] attorney's conflict of interest" in order to prevail, *Infante*, 404 F.3d at 391, he still must show that the *reason* Colwart did not refer to the prior inconsistent statement was his conflict of interest, *see Perillo*, 205 F.3d at 807 ("[The defendant] must show, not only that [his attorney's] performance was compromised, but that the compromises revealed in the record were generated by the actual conflict between [the two clients'] interests."). In this case, there is plentiful—and undisputed—evidence that strongly indicates Colwart bore no residual loyalty to Coslow, but was instead a zealous advocate for Lee. Colwart aggressively questioned Coslow about his motives for testifying, about his willingness to lie to law enforcement to shield his wife from possible prosecution, and about his lack of first-hand knowledge of the events of the murder. He questioned Coslow about the group's drug use on the trip, and explicitly asked Coslow if he had killed Tibblas. Even Lee concedes that Coslow's credibility "was on shaky ground," a circumstance that was due in part to Colwart's willingness to ask about Coslow's negotiations with the state for a lighter sentence. Whatever further damage confronting Coslow with a prior inconsistent statement would have done to his

credibility, it is clear that Colwart's failure to do so was not the result of his judgment having been "actually fettered by concern over the effect of certain trial decisions on other clients." *Perillo*, 205 F.3d at 807. The First Circuit could easily have concluded that the causal link between Colwart's conflict of interest and his decision not to raise the issue of Coslow's prior inconsistent statement was not adequately established. There thus exists a credible basis on which the First Circuit could reach its resolution of the adverse effect issue. Adhering the requirements of § 2254(d)(1), we give deference to this decision, and likewise reject Lee's claims.

## III.  CONCLUSION

Colwart's conduct did not affect the quality of his representation to the degree required by AEDPA. For the foregoing reasons, we AFFIRM the decision of the district court.